# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WELFARE PLAN OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS LOCALS 137, 137A, 137B, 137C, 137R, on behalf of itself and those similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>AMARIN PHARMA, INC., AMARIN PHARMACEUTICALS IRELAND LIMITED, AMARIN CORPORATION PLC,<br><br>      Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded |

**TABLE OF CONTENTS**

**Page**

ACRONYMS...................................................................................................................VII

I.     INTRODUCTION ......................................................................................................1

II.    JURISDICTION AND VENUE ...............................................................................2

III.   THE PARTIES .........................................................................................................3

      A.     Plaintiff...........................................................................................................3

      B.     Defendants......................................................................................................4

IV.   INTERSTATE TRADE AND COMMERCE ...........................................................4

V.    REGULATORY FRAMEWORK .............................................................................5

      A.     The regulatory structure for approval and substitution of generic
              drugs flows from the FDCA and the FDA and intersects with the
              patent framework. ........................................................................................5

              1.     Congress designed the Hatch-Waxman Amendments to
                      the FDCA to encourage and hasten generic entry and
                      reduce healthcare costs. ..................................................................6

              2.     The FDA may grant regulatory exclusivities for new
                      drugs but those exclusivities do not necessarily bar
                      generic entry.....................................................................................7

              3.     The first ANDA filer to issue a paragraph IV certification
                      is entitled, once approved, to 180 days as the only ANDA
                      generic on the market.......................................................................9

              4.     Section viii carveouts and labeling can enable generics to
                      lawfully enter the market. ...............................................................11

               5.     Patents are not bulletproof. ............................................................12

               6.     Development and sale of a drug's active pharmaceutical
                      ingredient is a lengthy and highly regulated process..................14

      B.     AB-rated generics drive down prices for purchasers, quickly and
               dramatically...................................................................................................15

               1.     The first AB-rated generic is priced below the brand,
                      driving sales to the generic. ............................................................16

                 2.     Later generics drive prices down further. ......................................17

VI.   FACTS....................................................................................................................19

      A.     Amarin launches Vascepa in 2013..............................................................19

      B.     Amarin engages in—and loses—patent litigation over Vascepa............21

               1.     Amarin files, and loses, patent ligation against generic
                      competitors. ....................................................................................21

|   | 2. | Amarin settles with Teva and Apotex, significantly delaying the date of their generic launch...................................................24 |
|---|---|---|
|   | C. | Generic competitors obtain the regulatory approvals needed to launch in mid-2020. ........................................................................25 |
|   | D. | Amarin impedes generic competition for Vascepa through anticompetitive API agreements. ......................................................26 |
|   | 1. | Amarin uses exclusive licenses to tie up API supply. ...................26 |
|   | 2. | Amarin's anticompetitive conduct handicaps Hikma's launch of generic Vascepa...............................................................34 |
|   | 3. | Amarin's anticompetitive conduct thwarts DRL's launch of generic Vascepa. ..............................................................35 |
|   | 4. | Amarin sues Hikma for induced infringement. ..............................36 |

VII.    AMARIN'S MONOPOLY POWER .......................................................37

VIII.   ANTITRUST INJURY ...........................................................................40

IX.     CLASS ACTION ALLEGATIONS.......................................................41

X.      FEDERAL CLAIMS FOR RELIEF ......................................................43

COUNT ONE: VIOLATION OF 15 U.S.C. § 1 CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE ...........................43

COUNT TWO: VIOLATION OF 15 U.S.C. § 2 UNLAWFUL MONOPOLIZATION ...........................................................................45

COUNT THREE: DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 2 OF THE SHERMAN ACT ....................................46

XI.     VIOLATIONS OF STATE ANTITRUST LAWS.................................48

COUNT FOUR: VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT, ARIZ. REV. STAT. § 44-1401, *ET SEQ.* ...........................49

COUNT FIVE: VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT, D.C. CODE § 28-4501, *ET SEQ.* ..................................49

COUNT SIX: VIOLATION OF THE ILLINOIS ANTITRUST ACT, 740 ILL. COMP. STAT. ANN. 10/3(1), *ET SEQ.* ...........................................50

COUNT SEVEN: VIOLATION OF THE IOWA COMPETITION LAW IOWA CODE § 553.1, *ET SEQ.* ......................................................51

COUNT EIGHT: VIOLATION OF MAINE'S ANTITRUST STATUTE ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ.* ...........................52

COUNT NINE: VIOLATION OF MARYLAND'S ANTITRUST STATUTE MD. CODE ANN. § 11-204(A), *ET SEQ.* ...........................53

COUNT TEN: VIOLATION OF MASSACHUSETTS MASS. GEN. LAWS CH. 93A, §1, *ET SEQ.* ...........................................................54

COUNT ELEVEN: VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT MICH. COMP. LAWS § 445.771, *ET SEQ.* .............................55

COUNT TWELVE: VIOLATION OF THE MINNESOTA ANTITRUST LAW, MINN. STAT. §§ 325D.49 *ET SEQ.* & 325D.57, *ET SEQ.* ..........................................................................................56

COUNT THIRTEEN: VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE, MISS. CODE ANN. § 75-21-1, *ET SEQ.* ..............................57

COUNT FOURTEEN: VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT, MO. ANN. STAT. § 407.010, *ET SEQ.* ....................................................................................58

COUNT FIFTEEN: VIOLATION OF THE NEBRASKA JUNKIN ACT, NEB. REV. STAT. § 59-801, *ET SEQ.* ..........................................59

COUNT SIXTEEN: VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. § 598A.010, *ET SEQ.* ........................59

COUNT SEVENTEEN: VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE, N.H. REV. STAT. ANN. TIT. XXXI, § 356, *ET SEQ.* ....................................................................................61

COUNT EIGHTEEN: VIOLATION OF THE NEW MEXICO ANTITRUST ACT, N.M. STAT. ANN. §§ 57-1-1, *ET SEQ.* ..........................61

COUNT NINETEEN: VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL BUSINESS LAW ..............................................................62

COUNT TWENTY: VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES, N.C. GEN. STAT. § 75-1, *ET SEQ.* ..........................63

COUNT TWENTY-ONE: VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D. CENT. CODE § 51-08.1, *ET SEQ.* ....................................................................................64

COUNT TWENTY-TWO: VIOLATION OF THE OREGON ANTITRUST LAW, OR. REV. STAT. § 646.705, *ET SEQ.* ..........................64

COUNT TWENTY-THREE: VIOLATION OF THE PUERTO RICO ANTITRUST ACT, P.R. LAWS TIT. 10 § 260, *ET SEQ.* ..........................65

COUNT TWENTY-FOUR: VIOLATION OF THE RHODE ISLAND ANTITRUST ACT, R.I. GEN LAWS § 6-36-1, *ET SEQ.* ..............................66

COUNT TWENTY-FIVE: VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE, S.D. CODIFIED LAWS § 37-1-3.1, *ET SEQ.* ....................................................................................67

COUNT TWENTY-SIX: VIOLATION OF THE UTAH ANTITRUST ACT, UTAH CODE ANN. §§ 76-10-911, *ET SEQ.* ..............................67

COUNT TWENTY-SEVEN: VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT, W. VA. CODE §47-18-1, *ET SEQ.* ..............................68

COUNT TWENTY-EIGHT: VIOLATION OF THE WISCONSIN
ANTITRUST ACT, WIS. STAT. ANN. § 133.01(1), *ET SEQ.* ...........................69

XII.    VIOLATIONS OF STATE CONSUMER PROTECTION LAWS................................70

COUNT TWENTY-NINE: VIOLATION OF ARIZONA CONSUMER
FRAUD ACT ARIZ. REV. STAT. §§44-1521, *ET SEQ.* .....................................71

COUNT THIRTY: VIOLATION OF CALIFORNIA'S UNFAIR
COMPETITION LAW CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*
(THE "UCL")...........................................................................................................72

COUNT THIRTY-ONE: VIOLATION OF THE DISTRICT OF
COLUMBIA CONSUMER PROTECTION PROCEDURES ACT, D.C.
CODE § 28-3901, *ET SEQ.* ................................................................................74

COUNT THIRTY-TWO: VIOLATION OF THE FLORIDA
DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT.
§ 501.201(2), *ET SEQ.* ........................................................................................75

COUNT THIRTY-THREE: VIOLATION OF THE ILLINOIS
CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES
ACT, 815 ILL. COMP. STAT. ANN. 505/10A, *ET SEQ.* ................................76

COUNT THIRTY-FOUR: VIOLATION OF THE MASSACHUSETTS
CONSUMER PROTECTION ACT, MASS. GEN. LAWS. CH. 93A § 1,
*ET SEQ.* ..................................................................................................................77

COUNT THIRTY-FIVE: VIOLATION OF THE MINNESOTA
CONSUMER FRAUD ACT, MINN. STAT. § 325F.68, *ET SEQ.* ...................78

COUNT THIRTY-SIX: VIOLATION OF THE MONTANA UNFAIR
TRADE PRACTICES AND CONSUMER PROTECTION ACT OF
1970, MONT. CODE, §§ 30-14-103, *ET SEQ.* AND §§ 30-14-201,
*ET SEQ.* ..................................................................................................................80

COUNT THIRTY-SEVEN: VIOLATION OF THE NEBRASKA
CONSUMER PROTECTION ACT, NEB. REV. STAT. § 59-1602,
*ET SEQ.* ..................................................................................................................80

COUNT THIRTY-EIGHT: VIOLATION OF THE NEVADA
DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT.
§ 598.0903, *ET SEQ.* ...........................................................................................81

COUNT THIRTY-NINE: VIOLATION OF THE NEW HAMPSHIRE
CONSUMER PROTECTION ACT, N.H. REV. STAT. ANN. TIT.
XXXI, § 358-A, *ET SEQ.* ...................................................................................83

COUNT FORTY: VIOLATION OF THE NEW MEXICO UNFAIR
PRACTICES ACT, N.M. STAT. ANN. §§ 57-12-1, *ET SEQ.* .........................84

COUNT FORTY-ONE: VIOLATION OF THE NORTH CAROLINA
UNFAIR TRADE AND BUSINESS PRACTICES ACT, N.C. GEN.
STAT. § 75-1.1, *ET SEQ.* ....................................................................................85

COUNT FORTY-TWO: VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT, OR. REV. STAT. § 646.605, *ET SEQ.*................................................................................................86

COUNT FORTY-THREE: VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT, R.I. GEN. LAWS § 6-13.1-1, *ET SEQ.*................................................................................................87

COUNT FORTY-FOUR: VIOLATION OF THE SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-10, *ET SEQ.*......................................................................88

COUNT FORTY-FIVE: VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW, S.D. CODIFIED LAWS § 37-24, *ET SEQ.*..................89

COUNT FORTY-SIX: VIOLATION OF THE VERMONT CONSUMER FRAUD ACT VT. STAT. ANN. TIT. 9, CH. 63 §2451, *ET SEQ.*................................................................................................90

COUNT FORTY-SEVEN: VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT, VA. CODE ANN. § 59.1- 196, *ET SEQ.*................................................................................................91

COUNT FORTY-EIGHT: VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT, W. VA. CODE § 46A-6-101, *ET SEQ.*..............................................................92

COUNT FORTY-NINE: UNJUST ENRICHMENT................................................93

A.    Alabama..........................................................................................94

B.    Alaska..............................................................................................94

C.    Arizona............................................................................................95

D.    Arkansas..........................................................................................95

E.    California..........................................................................................95

F.    District of Columbia......................................................................96

G.    Florida..............................................................................................96

H.    Georgia............................................................................................96

I.    Hawaii..............................................................................................97

J.    Idaho................................................................................................97

K.    Illinois..............................................................................................97

L.    Iowa..................................................................................................98

M.    Kansas..............................................................................................98

N.    Maine................................................................................................98

O.    Maryland..........................................................................................99

P.    Massachusetts..................................................................................99

Q.      Michigan .................................................................................................99

R.      Minnesota ............................................................................................ 100

S.      Mississippi ........................................................................................... 100

T.      Missouri ............................................................................................... 101

U.      Montana ............................................................................................... 101

V.      Nebraska ............................................................................................... 101

W.      Nevada .................................................................................................. 102

X.      New Hampshire .................................................................................... 102

Y.      New Mexico .......................................................................................... 102

Z.      New York .............................................................................................. 103

AA.     North Carolina ...................................................................................... 103

BB.     North Dakota ........................................................................................ 104

CC.     Oregon .................................................................................................. 104

DD.     Pennsylvania ......................................................................................... 104

EE.     Puerto Rico ........................................................................................... 105

FF.     Rhode Island ......................................................................................... 105

GG.     South Carolina ...................................................................................... 106

HH.     South Dakota ........................................................................................ 106

II.     Tennessee .............................................................................................. 106

JJ.     Utah ...................................................................................................... 107

KK.     Vermont ................................................................................................ 107

LL.     Virginia ................................................................................................. 108

MM.     West Virginia ........................................................................................ 108

NN.     Wisconsin ............................................................................................. 108

OO.     Wyoming .............................................................................................. 109

XIII.   COMPLIANCE WITH NOTICE REQUIREMENTS ......................... 109

XIV.    PRAYER FOR RELIEF ................................................................... 110

XV.     JURY DEMAND ............................................................................... 111

**ACRONYMS**

| | |
|---|---|
| ANDA | Abbreviated new drug application |
| API | Active pharmaceutical ingredient |
| DMF | Drug master file |
| DRL | Dr. Reddy's Laboratories |
| FDA | Federal Drug Administration |
| FTC | Federal Trade Commission |
| HTG | Hypertriglyceridemia |
| NDA | New drug application |
| PTO | U.S. Patent and Trademark Office |
| sNDA | Supplemental new drug application |
| TG | Triglyceride |

Plaintiff Welfare Plan of The International Union of Operating Engineers Locals 137, 137A, 137B, 137C, 137R ("IUOE Local 137"), files this action, individually on behalf of itself and as a class action on behalf of all others similarly situated, against defendants Amarin Pharma, Inc., Amarin Pharmaceuticals Ireland Limited, and Amarin Corporation PLC (collectively "Amarin" or "the defendants") for damages, injunctive relief, and any and all other available forms of relief. The plaintiff demands a trial by jury on all issues so triable and complains and alleges as follows:

## I.    INTRODUCTION

1.    Faced with inevitable competition for its sole product, Vascepa, and having lost in litigation and exhausted every regulatory means to prevent and delay the launch of generic competitors, Amarin adopted an unlawful strategy to artificially extend its monopoly. By locking up every viable supplier of the key ingredient needed to manufacture generic Vascepa, Amarin boxed generic manufacturers out of the market. This scheme left Amarin free to continue charging supracompetitive prices and eke the most profit it could out of Vascepa, at the expense of the plaintiff and other purchasers of the drug.

2.    By May 2020, price competition for Vascepa was imminent: two generic manufacturers had obtained every regulatory approval they needed to launch their products and a federal court had invalidated every patent that Amarin claimed protected the drug from generic competition.

3.    But Amarin was unsatisfied with the more than seven years of monopoly pricing it had enjoyed to date. The company's desperation to protect Vascepa has a ready explanation: Vascepa is Amarin's *only* product. And without any competitors on the market, Amarin had been able to increase the price of Vascepa every year since the product's launch in 2013 and charge monopoly prices throughout.

4.      And so, when competition loomed, Amarin adopted a strategy to unlawfully shield its prized product and its high prices: preventing would-be competitors from obtaining the active pharmaceutical ingredient (API) required to manufacture Vascepa.

5.      Amarin successfully boxed out its competition by locking up the supply of icosapent ethyl, Vascepa's API through its supply agreements with API manufacturers, which included exclusive dealing and/or minimum purchasing agreements. Years before generic entry was set to occur, Amarin began entering into these deals with every viable icosapent ethyl supplier. In essence, Amarin paid these API suppliers not to do business with any manufacturer of generic Vascepa.

6.      As a result of Amarin's conduct, would-be competitors were unable to obtain the icosapent ethyl they needed for their generic Vascepa products, delaying their fulsome entry into the market by years. But for Amarin's anticompetitive conduct, robust generic competition would have begun in mid-2020. Instead, Amarin has been able to maintain its monopoly and continue charging supracompetitive prices, harming the plaintiff and other purchasers of Vascepa.

## II.    JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(d), because this is a class action involving common questions of law of fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than one hundred members of the class, and at least one member of the putative class is a citizen of a state different from that one of the defendants.

8.      This Court has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and 28 U.S.C. §§ 1331 and 1337. This Court's exercise of

- 2 -

supplemental jurisdiction over the plaintiff's state law claims would avoid unnecessary duplication and multiplicity of actions and should be exercised in the interests of judicial economy, convenience, and fairness.

9.      Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to the plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

10.     This Court has personal jurisdiction over the defendants because each has the requisite constitutional contacts with the state of New Jersey due to their domicile, the extent of their business transactions within New Jersey, their contracts to supply goods and services in New Jersey, their solicitation of business in New Jersey, and/or commission of illegal acts as alleged herein within the state of New Jersey. Each defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

### III.    THE PARTIES

**A.    Plaintiff**

11.     Plaintiff Welfare Plan of the International Union of Operating Engineers Locals 137, 137A, 137B, 137C, 137R is a labor union with a principal address of 1360 Pleasantville

- 3 -

Road, Briarcliff Manor, New York 10510. The plaintiff provides health benefit, including prescription drug benefits, to its members, plus their spouses and dependents.

12.    During the class Period, the defendants' anticompetitive and deceptive conduct caused the plaintiff to pay for and/or reimburse purchases of brand and (the limited available) generic Vascepa at artificially inflated prices. Plaintiff paid for and/or reimbursed for purchases of brand and (the limited available) generic Vascepa at grossly inflated prices and was injured due to the anticompetitive and deceptive practices alleged in this Complaint.

**B.    Defendants**

13.    Defendant Amarin Pharma, Inc. is a company organized and existing under the laws of Delaware with its principal place of business at 1430 Route 206, Bedminster, New Jersey 07921. Amarin Pharma, Inc. is a wholly-owned subsidiary of Amarin Corporation PLC.

14.    Defendant Amarin Pharmaceuticals Ireland Limited is a company incorporated under the laws of Ireland with registered offices at 88 Harcourt Street, Dublin 2, Dublin, Ireland. Amarin Pharmaceuticals Ireland Limited is a wholly owned subsidiary of Amarin Corporation PLC.

15.    Defendant Amarin Corporation PLC is a company incorporated under the laws of England and Wales with its registered office at One New Change, London, EC4M 9AF, England and its principal executive offices at 2 Pembroke House, Upper Pembroke Street 28-32, Dublin 2, Ireland.

## IV.    INTERSTATE TRADE AND COMMERCE

16.    From January 2013 through at least November 2020, Amarin was the sole provider of Vascepa in the United States. At all material times, Amarin manufactured and sold Vascepa, directly or through one or more of its affiliates, throughout the United States and in this District, in a continuous and uninterrupted flow through interstate commerce.

– 4 –

17.     By inflating, maintaining, or artificially stabilizing the price for Vascepa, the defendants deprived purchasers of Vascepa of the benefits of free and open competition, and thus had a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States, as well as intrastate commerce within each state.

18.     Such effects, including the inflated prices that the plaintiff and members of the proposed class paid for Vascepa during the Class Period, caused antitrust injury in the United States, and give rise to the plaintiff's claims.

## V.    REGULATORY FRAMEWORK

**A.    The regulatory structure for approval and substitution of generic drugs flows from the FDCA and the FDA and intersects with the patent framework.**

19.     Under the Federal Food, Drug, and Cosmetic Act (FDCA),[1] manufacturers that create a new drug must obtain approval from the Food and Drug Administration (FDA) to sell the product by filing a New Drug Application (NDA).[2] An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.[3]

20.     When the FDA approves a brand manufacturer's NDA, the manufacturer may list in *Approved Drug Products with Therapeutic Equivalence Evaluations* (known as the "Orange Book") certain kinds of patents that the manufacturer asserts could reasonably be enforced against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents.[4] The manufacturer may list in the Orange Book

---

[1] Pub. L. No. 75–717, 52 Stat. 1040 (1938) (codified as amended in 21 U.S.C. § 301 *et seq.*).

[2] 21 U.S.C. §§ 301–392.

[3] 21 U.S.C. § 355(a), (b).

[4] For example, patents covering processes for making drug products may not be listed in the Orange Book.

– 5 –

within 30 days of issuance any patents issued after the FDA approved the NDA.[5] Valid and infringed patents may lawfully prevent generic competition, at least for a period, but manufacturers can abuse the system to use invalid or non-infringed patents to unlawfully delay generic competition.

21.     The FDA relies completely on the brand manufacturer's truthfulness about patent validity and applicability because it does not have the resources or authority to verify the manufacturer's patents for accuracy or trustworthiness. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

  **1. Congress designed the Hatch-Waxman Amendments to the FDCA to encourage and hasten generic entry and reduce healthcare costs.**

22.     The FDCA's Hatch-Waxman Amendments, enacted in 1984, simplified regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.[6] A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application (ANDA). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA and must show that the generic contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug and that it is bioequivalent, *i.e.*, absorbed at the same rate and to the same extent as the brand. The FDA assigns a generic that meets these criteria relative to its brand counterparts an "AB" rating, making it an "AB-rated" generic.

23.     The FDCA and Hatch-Waxman Amendments operate on the principle that bioequivalent drug products containing identical amounts of the same active ingredients,

---

[5] 21 U.S.C. § 355(b)(1), (c)(2).

[6] *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355).

having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic is present in the blood of a patient to the same extent and for the same amount of time as the brand counterpart.[7]

24.    Through the Hatch-Waxman Amendments, Congress sought to expedite the entry of less expensive generic competitors to brand drugs, thereby reducing healthcare expenses nationwide. Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

25.    The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches and ushering in an era of historically high profit margins for brand pharmaceutical manufacturers. In 1983, before the Hatch-Waxman amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, revenues for brand and generic prescription drugs totaled $21.6 billion; by 2013, total prescription drug revenues had climbed to more than $329.2 billion, with generics accounting for 86% of prescriptions.[8] Generics are dispensed about 95% of the time when a generic form is available.[9]

**2.    The FDA may grant regulatory exclusivities for new drugs but those exclusivities do not necessarily bar generic entry.**

26.    To promote a balance between new drug innovation and generic drug competition, the Hatch-Waxman Amendments also provide for exclusivities (or exclusive

---

[7] 21 U.S.C. § 355(j)(8)(B).

[8] *See* IMS Institute for Healthcare Informatics, *Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013* 30, 51 (2014).

[9] *Id.* at 51.

marketing rights) for new drugs. The FDA grants any such exclusivities upon approval of a drug if the sponsor and/or drug meet the relevant statutory requirements. Any such exclusivities for a drug are listed in the Orange Book, along with any applicable patents, and can run concurrently with the listed patents.

27.     One such exclusivity, the New Chemical Entity (NCE) exclusivity, applies to products containing chemical entities never previously approved by the FDA either alone or in combination. If a product receives NCE exclusivity, the FDA may not accept for review any ANDA for a drug containing the same active moiety for five years from the date of the NDA's approval, unless the ANDA contains a certification of patent invalidity or non-infringement, in which case an application may be submitted after four years.[10]

28.     A drug product may also receive a three-year period of exclusivity if its sponsor submits a supplemental application (sNDA) that contains reports of new clinical investigations (other than bioavailability studies) conducted or sponsored by the sponsor that were essential to approval of the supplemental application. If this exclusivity is granted, the FDA may not approve an ANDA for that drug for three years from the date on which the supplemental application is approved.[11]

29.     Regulatory exclusivities may not be absolute bars to generic entry. For example, some can be overcome by carving out information in the label or for other reasons.[12]

---

[10] 21 U.S.C. § 355(j)(5)(F)(ii); 21 C.F.R. § 314.108(b)(2).

[11] 21 U.S.C. § 355(j)(5)(F)(iv); 21 C.F.R. § 314.108(b)(2)(5).

[12] *See, e.g.*, 21 C.F.R. §§ 314.94(a)(8)(iv), 314.127(a)(7); 21 U.S.C. § 355a(o).

**3.    The first ANDA filer to issue a paragraph IV certification is entitled, once approved, to 180 days as the only ANDA generic on the market.**

30.    To obtain FDA approval of an ANDA, a manufacturer must certify that the generic will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

a.    That no patent for the brand has been filed with the FDA (a "paragraph I certification");

b.    That any patent(s) for the brand has/have expired (a "paragraph II certification");

c.    That any patent(s) for the brand will expire on a particular date and the manufacturer does not seek to market its generic before that date (a "paragraph III certification"); or

d.    That any patent(s) for the brand is/are invalid or will not be infringed by the generic manufacturer's proposed product (a "paragraph IV certification").[13]

31.    If a generic manufacturer files a paragraph IV certification, a brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the paragraph IV certification, the FDA will not grant final approval to the ANDA-filer (which would enable the manufacturer to market and sell its product) until the earlier of (i) the passage of two-and-a-half years, or (ii) the issuance of a decision by a court that the patent at issue is invalid or not infringed by the generic manufacturer's ANDA.[14] Until one of those conditions occurs, the FDA may only grant

---

[13] 21 U.S.C. § 355(j)(2)(A)(vii).

[14] 21 U.S.C. § 355(j)(5)(B)(iii). This period is commonly called a "30-month Hatch-Waxman stay" or "30-month stay." The brand/patent holder can choose to sue the generic after 45 days, including waiting until the generic has launched its product, but, in that event, the brand cannot take advantage of the 30-month stay of FDA approval, and must instead satisfy the showing required to obtain a preliminary injunction to prevent the generic launch.

"tentative approval," meaning the ANDA meets all regulatory requirements and is approvable but for the 30-month stay.

32.     To encourage manufacturers to seek approval of generic versions of brand drugs, the Hatch-Waxman Amendments grant the first paragraph IV generic manufacturer ANDA filer ("first-filer") a 180-day exclusivity period to market the generic version of the drug; the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand drug during that time.[15] That is, when a first-filer files a substantially complete ANDA with the FDA and certifies that the unexpired patents listed in the Orange Book as covering the brand are either invalid or not infringed by the generic, the FDA cannot approve a later generic manufacturer's ANDA until that first-filer generic(s) has been on the market for 180 days.[16]

33.     The 180-day window is often referred to as the first filer's six-month or 180-day "exclusivity"; this is a bit of a misnomer, though, because a brand manufacturer can launch an authorized generic (AG) at any time, manufacturing its AG in accordance with its approved NDA for the branded product but selling at a lower price point.

34.     A first filer who informs the FDA it intends to wait until all Orange Book-listed patents expire before marketing its generic does not get a 180-day exclusivity period. Congress created this 180-day period to incentivize generic manufacturers to challenge weak or invalid patents or to invent around such patents by creating non-infringing generics.

---

[15] 21 U.S.C. § 355(j)(5)(B)(iv), (D).

[16] There is an exception: if the first-filer forfeits exclusivity. A first filer can forfeit its 180-day exclusivity by, for example, failing to obtain tentative approval from the FDA for its ANDA within 30 months of filing its ANDA. There is no forfeiture here.

**4.     Section viii carveouts and labeling can enable generics to lawfully enter the market.**

35.     The Hatch-Waxman Act encourages generic manufacturers to seek approval of generic products for uses that do not infringe valid and enforceable patents. The Act recognizes that a generic may infringe one (patented) method of use without infringing another and encourages generics to "carve out" would-be infringing uses to bring products to market quickly.

36.     To carve out on a non-infringing use, an ANDA applicant may submit a section viii statement. A section viii statement asserts that the generic manufacturer will market the drug for one or more methods of use *not covered* by the brand's valid and enforceable patents.[17] If an ANDA applicant files a section viii statement, the patent claiming the protected method of use will not serve as a barrier to ANDA approval.

37.     A section viii statement is commonly used when the brand's patent on the drug compound has expired and the brand holds patents on only some approved methods of using the drug. The ANDA applicant then proposes labeling for the generic drug that "carves out" from the brand's approved label the still-patented methods of use.

38.     Typically, the Hatch-Waxman Act requires that an ANDA contain "information to show that the labeling proposed for the new [generic] drug is the same as the labeling approved for the listed drug[.]"[18] However, FDA regulations also expressly recognize that by submitting a section viii statement, an ANDA applicant may omit from the proposed labeling a method of use protected by a listed patent, and therefore need not seek approval for that use.[19]

---

[17] 21 U.S.C. § 355(j)(2)(A)(viii).

[18] 21 U.S.C. § 355(j)(2)(A)(v).

[19] *See* 21 CFR § 314.94(a)(8)(iv) ("Such differences between the applicant's proposed labeling and labeling approved for the reference listed drug may include … omission of an indication or

- 11 -

As the Supreme Court has recognized, "[t]he statutory scheme, in other words, contemplates that one patented use will not foreclose marketing a generic drug for other unpatented ones."[20]

39.     Thus, under the statute, regulations, and applicable case law, the carve-out of patent-protected labeling is generally permitted if the omission does not render the proposed drug product less safe or effective for the conditions of use that remain in the labeling.

**5.    Patents are not bulletproof.**

40.     The existence of one or more patents purporting to cover a drug product does not guarantee a monopoly. Patents are routinely invalidated or held unenforceable, either upon reexamination or in *inter partes* proceedings by the U.S. Patent and Trademark Office (PTO), by court decision, or by jury verdict. A patent holder always bears the burden of proving infringement.

41.     One way that a generic can prevail in patent infringement litigation is to show that its product does not infringe the patent (and/or that the patent holder cannot meet its burden to prove infringement). Another is to show that the patent is invalid or unenforceable.

42.     A patent is invalid or unenforceable when: (i) the disclosed invention is obvious in light of earlier prior art; (ii) an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or deceive the PTO, fails to disclose material information known to that person to be material, or submits materially false information to the PTO during prosecution; and/or (iii) when a later acquired patent is not patentably distinct

_____

other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(5)(F) of the Federal Food, Drug, and Cosmetic Act."); *see also* 21 CFR § 314.127(a)(7).

[20] *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 415 (2012); *see also Purepac Pharmaceutical Company v. Thompson*, 354 F.3d 877, 880 (D.C. Cir. 2004) (upholding generic's right to file a section viii statement and carve out from labeling method-of use information protected by a patent); *TorPharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 73 (D.D.C. 2003), *aff'd sub nom. Purepac Pharm. Co. v. Thompson*, 354 F.3d 877 (D.C. Cir. 2004) (same).

- 12 -

from the invention claimed in an earlier patent (and no exception, such as the safe harbor, applies).

43.     In these circumstances, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent, and (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit.

44.     As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or not infringed than upheld. The FTC reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002.[21] An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.[22]

45.     If a generic manufacturer successfully defends against the brand's infringement lawsuit—either by showing that its ANDA does not infringe any asserted patents and/or that any asserted patents are invalid or unenforceable—the generic may enter the market immediately upon receiving approval from the FDA.

---

[21] FTC, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* vi-vii (2002), *available at* https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf (last accessed June 7, 2021).

[22] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 TEX. L. REV. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.).

011009-11/1559228 V1

6.    **Development and sale of a drug's active pharmaceutical ingredient is a lengthy and highly regulated process.**

46.    All drugs are made up of two core components—the active pharmaceutical ingredient (API), which is the biologically active component of a drug product and the central ingredient, and the excipient(s), the other ingredient(s) that help deliver the medication to your system. The API is the part of any drug that produces the intended effects. Excipients are chemically inactive substances, such as lactose or mineral oil in the pill.

47.    Brand and generic manufacturers ordinarily purchase the API for their drugs from API suppliers. The manufacturers combine the API with inactive ingredients and process the drugs into their final dosage form. The API for a brand drug and its generic equivalent is the same.

48.    APIs are subject to stringent regulations and oversight by the FDA. To sell an API in the United States, the API supplier must file a Drug Master File (DMF) with the FDA. The DMF provides confidential and detailed information about, among other things, the facilities and processes used to manufacture, process, package, and store the API.

49.    In its application for FDA approval, a manufacturer must identify its API supplier and that supplier's DMF. More than one manufacturer can reference the DMF of the same API supplier. As part of its review of an NDA or ANDA, the FDA performs a complete review of the technical information contained in the DMF referenced therein, including, among other things, inspecting the API supplier's facilities described in the DMF.

50.    The entire process—from the supplier's development of the API to the FDA's approval of the supplier's DMF in support of an NDA or ANDA—ordinarily takes more than a year to complete, and can take up to three years.

51.    If a manufacturer wants or needs to change its API supplier for a drug, it must file a supplement with the FDA referencing the new API supplier's DMF and submit data for

drug batches using the new supplier's API. The manufacturer may only market its drug using the new supplier's API if the FDA approves of the change. FDA review and approval of the change in API supplier can take six months or more.

52.    To speed up the process, generic drug manufacturers typically seek to use API from suppliers that already have a DMF on file, rather than partnering with API suppliers that have not yet filed a DMF. But where existing API suppliers are unable or unwilling to supply to a generic manufacturer, the generic manufacturer may need to develop and work with a new supplier—one that does not yet have a DMF on file—to develop the API for a specific drug, including providing specifications, information, and data to the API supplier; co-developing the API; and overseeing the quality control in the development of the API. These collaborations take much more time and involve much greater expense.

53.    Because of the significant costs involved in qualifying an API supplier as well as the need to continue to ensure quality control by the API supplier, it is industry practice for both brand and generic drug manufacturers to use only one or two API suppliers to support a drug application. It is unusual and contrary to industry practice for a brand or generic manufacturer to have multiple exclusive API supply contracts, or for a manufacturer to acquire significant excess API supplies due to, among other things, the costs of acquisition and storage and quality control issues.

**B.    AB-rated generics drive down prices for purchasers, quickly and dramatically.**

54.    Generic versions of brand drugs contain the same active ingredient(s) as the brand name drug and are determined by the FDA to be just as safe and effective as their brand counterparts. Because the brand and its AB-rated generics are essentially commodities that cannot be therapeutically differentiated, the primary basis for competition between a brand product and its generic version, or between multiple generic versions, is price.

55.     Without AB-rated generics in the market, the manufacturer of a brand drug has a monopoly—every sale of the product, and the accompanying profit, benefits the brand manufacturer. Without AB-rated generic competition, brand manufacturers can, and routinely do, sell their drug for far more than the marginal cost of production, generating profit margins above 70% while making hundreds of millions of dollars in sales. The ability to command these kinds of profit margins is what economists call market power.

56.     When a generic equivalent enters the market, however, it quickly captures 80% or more of the unit sales from the brand drug. When generic entry occurs, the brand manufacturer loses most of the unit sales; the generic manufacturer sells most of the units, but at drastically reduced prices, delivering enormous savings to drug purchasers. And when multiple generics compete in the market, that competition drives prices down to near the marginal cost of production. This competition ends the brand manufacturer's market power and delivers enormous savings to drug purchasers. Competition converts what formerly were excess profits into purchaser savings.

**1.     The first AB-rated generic is priced below the brand, driving sales to the generic.**

57.     Since the passage of the Hatch-Waxman Amendments, every state has adopted drug product selection laws that either require or permit pharmacies to substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician specifically directs that substitution is not permitted). Substitution laws and other institutional features of pharmaceutical distribution and use create the economic dynamic that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing.

58.    Experience and economic research show that the first generic manufacturer to market its product prices it below its brand counterpart.[23] As a rule, generics are at least 10% less expensive than their brand counterparts when there is only one generic competitor. With the reduction in price and aided by state substitution laws, the first generic manufacturer almost always captures a large share of sales from the brand. And the presence of a generic at a lower price reduces the average price for the drug (brand and AB-rated generic combined).

59.    During the 180-day exclusivity period, the first filer is the only ANDA-approved generic manufacturer on the market. In the absence of competition from other generics, a first-filer generic manufacturer generally makes about 80% of all the profits that it will ever make on the product during that 180-day exclusivity period, a significant incentive for getting to market as quickly as possible.

60.    Once generic competition begins, it quickly captures sales of the corresponding brand drug, often 80% or more of the market within the first six months after entry. (This percentage erosion of brand sales holds regardless of the number of generic entrants.)

**2.    Later generics drive prices down further.**

61.    Once additional generic competitors enter the market, the competitive process accelerates, and multiple generic manufacturers typically compete vigorously with each other

---

[23] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* ii-iii, vi, 34 (2011), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf ("FTC 2011 AG Study") (last accessed June 7, 2021); FTC, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* 8 (2010), *available at* https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf ("FTC Pay-for-Delay Study") (last accessed June 7, 2021) at 1.

over price, driving prices down toward marginal manufacturing costs.[24] In a recent study, the Federal Trade Commission (FTC) found that on average, within a year of generic entry, generics had captured 90% of corresponding brand sales and (with multiple generics on the market) prices had dropped 85%.[25]

62.     According to the FDA and the FTC, the greatest price reductions are experienced when the number of generic competitors goes from one to two. The discount from the brand price typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand. Consequently, the launch of a generic usually results in significant cost savings for all drug purchasers: "[a]lthough generic drugs are chemically identical to their branded counterparts, they are typically sold at substantial discounts from the branded price. According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies. Even more billions are saved when hospitals use generics."[26]

63.     Generic competition enables all purchasers of a drug to (i) purchase generic versions of the drug at substantially lower prices, and/or (ii) purchase the brand at a reduced price. These competitive effects are known and reliable: brand sales decline to a small fraction of their level before generic entry and, as a result, brand manufacturers view competition from generics as a grave threat to their bottom lines.

---

[24] *See, e.g.,* Tracy Regan, *Generic Entry, Price Competition, and Market Segmentation in the Prescription Drug Market,* 26 INT'L J. INDUS. ORG. 930 (2008); Richard G. Frank, *The Ongoing Regulation of Generic Drugs,* 357 NEW ENG. J. MED. 1993 (2007); Patricia M. Danzon & Li-Wei Chao, *Does Regulation Drive Out Competition in Pharmaceutical Markets?,* 43 J.L. & ECON. 311 (2000).

[25] *See* FTC Pay-for-Delay Study.

[26] *See* "What Are Generic Drugs?," FDA (Aug. 24, 2017), *available at* https://www.fda.gov/drugs/generic-drugs/what-are-generic-drugs (last accessed June 7, 2021).

64.     Until a generic version of a brand drug enters the market, however, there is no bioequivalent drug to substitute for and compete with the brand, leaving the brand manufacturer to continue to profitably charge supracompetitive prices. Recognizing that generic competition will rapidly erode their brand sales, brand manufacturers seek to extend their monopoly for as long as possible, sometimes resorting to illegal means to delay or prevent generic competition.

## VI.    FACTS

### A.    Amarin launches Vascepa in 2013.

65.     Vascepa is the brand name for the icosapent ethyl drug product marketed by Amarin. It is a highly purified preparation of icosapent ethyl (also known as eicosapentaenoic acid or EPA), an omega-3 fatty acid derived from fish oil. Vascepa is available by prescription only.

66.     The FDA first approved Vascepa in July 2012 as an adjunct to diet to reduce triglyceride (TG) levels in adult patients with severe hypertriglyceridemia (HTG). Amarin currently markets Vascepa in both 1g and 500mg capsules. The daily dose of Vascepa is 4 grams per day, taken as two 1g (or four 500mg) capsules twice daily with food. The FDA granted NCE exclusivity for Vascepa, which ran from July 26, 2012 (the NDA approval date) until July 26, 2017.

67.     TGs are the most abundant type of fat in the blood and patients with HTG have elevated TGs. For most patients with elevated TGs, the primary aim of therapy is lowering LDL cholesterol (LDL-C) because elevated LDL-C is a major cause of coronary heart disease. But patients with severe HTG have an elevated risk of acute pancreatitis, a painful and potentially life-threatening condition. In patients with severe HTG, the primary aim of therapy is preventing acute pancreatitis by reducing TG levels.

68.     While Vascepa was originally approved for the treatment of severe HTG, Amarin submitted a supplemental NDA in March 2019, seeking approval for a second indication: as an adjunct to maximally tolerated statin therapy to reduce cardiovascular risk. The FDA approved this new indication on December 13, 2019, as well as a three-year exclusivity for Amarin for that indication; the exclusivity for the second indication is scheduled to expire on December 13, 2022.

69.     Since it first received FDA approval and in the absence of generic competition, Amarin has been steadily hiking the price of Vascepa. Amarin increased the price of Vascepa by approximately 51% between 2013 and 2017. Between December 2017 and November 2019, the price increased by approximately 8% for the 1g strength. Following the approval of the new indication in 2019, the list price for the 1g strength jumped by 9% as of September 2020.

70.     Vascepa earned Amarin $614 million in net product revenue in 2020, up from more than $429 million in 2019. Amarin's revenues have increased dramatically over the years and the company has stated that it believes Vascepa total net revenue "will grow to reach multiple billions of dollars" beyond 2020.

71.     Vascepa's importance to Amarin cannot be overstated: it is the company's *only* product. Indeed, Amarin described itself in its 2018 annual report as "substantially dependent upon sales of Vascepa in the United States" and admitted that "much of [Amarin's] near-term results and value as a company depends on our ability to execute our commercial strategy for Vascepa in the United States."[27]

---

[27] Amarin Corporation PLC, "Annual Report and Accounts for the Year Ended 31 December 2018," *available at* https://investor.amarincorp.com/static-files/f0b8f0dd-6bd8-4344-ba45-f13322a0df84.

- 20 -

72.     As its president and chief executive officer stated in a company press release, "Amarin's goal is to protect the commercial potential of Vascepa to 2030."[28] And it endeavored to do just that through an anticompetitive strategy to prevent generic competition, as described in more detail below.

**B.    Amarin engages in—and loses—patent litigation over Vascepa.**

**1.    Amarin files, and loses, patent ligation against generic competitors.**

73.     On or about July 26, 2016, three generic manufacturers—Hikma, DRL, and Teva—submitted to the FDA ANDAs seeking approval to market generic versions of Vascepa. All three manufacturers included in their applications paragraph IV certifications, alleging that any patents listed in the Orange Book as covering Vascepa were invalid and/or would not be infringed by their generic product. At the time, Amarin had listed in the Orange Book at least fourteen patents as covering Vascepa.

74.     On September 21, 2016, Hikma informed Amarin of its ANDA filing through a paragraph IV letter.[29] DRL sent Amarin its paragraph IV letter on September 22, 2016[30] and Teva sent its letter on October 7, 2016.

---

[28] Press Release, Amarin Corporation PLC, "Amarin Announces FDA New Chemical Entity Market Exclusivity Determination for Vascepa® (icosapent ethyl) Capsules," May 31, 2016, https://investor.amarincorp.com/static-files/05a3c6e5-31c5-47b4-b43a-3404e5950178.

[29] The Hikma ANDA (ANDA No. 209457) was submitted by Roxane Laboratories, Inc. but in December 2016, Roxane Laboratories, Inc. transferred the ANDA to West-Ward Pharmaceuticals International Limited. West-Ward Pharmaceuticals International Limited changed its name to Hikma Pharmaceuticals International Limited and, on July 8, 2019, transferred ANDA No. 209457 to Hikma Pharmaceuticals USA Inc.

[30] On or about July 11, 2018, DRL, through Dr. Reddy's Laboratories, Inc., submitted to the FDA a supplement to its ANDA (ANDA No. 209499) with paragraph IV certifications for 500 mg icosapent ethyl capsules. On July 11, 2018, DRL notified Amarin that it had submitted the supplement to ANDA No. 209499, with paragraph IV certifications for five of the Orange Book listed patents.

75.    Hikma, Teva, and DRL all sought to launch generic 1g Vascepa capsules for the treatment of severe HTG. As required by law, their ANDAs adopted the "same" labelling as Vascepa, which was then approved only for treatment of severe HTG.[31] When Amarin obtained a new indication for Vascepa in 2019, Hikma and DRL carved out this second, later indication from their labels, as permitted by the FDCA.

76.    Because Hikma, Teva, and DRL filed their ANDAs on the same day, each was considered a first filer and was entitled to 180-days of (shared) exclusivity for Vascepa, subject to their ability to obtain tentative approval from the FDA within thirty months of submitting their ANDA. If satisfied, this would lead to three, and potentially four, generic Vascepa products on the market at the start of generic competition: Hikma's, DRL's, and Teva's ANDA generics, and potentially (and likely) Amarin's authorized generic.

77.    Amarin sued Hikma for patent infringement on October 31, 2016 in a Nevada federal court.[32] Amarin sued DRL on November 4, 2016[33] and Teva on November 18, 2016.[34] Amarin's lawsuits against all three generics were consolidated in January 2017.[35] Amarin and Teva settled their litigation shortly thereafter, on May 24, 2018.

---

[31] *See* 21 U.S.C. §§ 355(j)(2)(A)(v), (j)(4)(G).

[32] *See Amarin Pharma Inc. et. al. v Hikma Pharmaceuticals USA Inc. et* al, Case No. 2:16-cv-025250-MMD-NJK (D. Nev.). Amarin alleged infringement of the following patents: U.S. Patent No. 8,293,728, U.S. Patent No. 8,318,715, U.S. Patent No. 8,357,677, U.S. Patent No. 8,367,652, U.S. Patent No. 8,377,920, U.S. Patent No. 8,399,446, U.S. Patent No. 8,415,335, U.S. Patent No. 8,426,399, U.S. Patent No. 8,431,560, U.S. Patent No. 8,440,650, U.S. Patent No. 8,518,929, U.S. Patent No. 8,524,698, U.S. Patent No. 8,546,372, and U.S. Patent No. 8,617,594.

[33] *Amarin Pharm., Inc. et al. v. Dr. Reddy's Labs, Inc. et al.*, Case No. 2:16-cv02562 (D. Nev.).

[34] *Amarin Pharm., Inc. et al. v. Teva Pharm. USA, Inc. et al.*, Case No. 2:16-cv-02658 (D. Nev.).

[35] *Amarin Pharm. Inc. et al. v Hikma Pharm. USA Inc. et* al, Case No. 2:16-cv-025250MMD-NJK (D. Nev.), ECF No. 30.

78.     Amarin asserted fourteen patents against Hikma and DRL. All of the allegedly infringed claims of those patents were directed to methods of treating severe HTG by administering 4 grams per day of purified icosapent ethyl (EPA).

79.     Amarin's litigation against Hikma and DRL proceeded to a bench trial in January 2020. On March 30, 2020, Judge Miranda M. Du invalidated all of Amarin's asserted patents and entered judgment for Hikma and DRL.[36] Judge Du concluded that while Hikma's and DRL's ANDAs infringed, all of Amarin's asserted patent claims were obvious, and thus the patents invalid.

80.     Amarin immediately released a public statement expressing its disagreement with the verdict and detailing Amarin's ongoing "effort to prevent a generic launch."[37]

81.     Amarin appealed Judge Du's order to the Court of Appeals for the Federal Circuit. On September 3, 2020, the appellate panel upheld the trial court's verdict, summarily affirming the invalidation of Amarin's patents the day after oral argument.[38] The court denied Amarin's motions for rehearing and rehearing *en banc* on November 4, 2020.[39] Amarin filed a petition of certiorari with the Supreme Court on February 11, 2021.[40]

82.     After the Court of Appeals order, Amarin again released a public statement criticizing the outcome of the litigation. This time, Amarin foreshadowed that generic manufacturers would have problems launching their products, despite their legal victories, due

---

[36] *Amarin Pharm., Inc. v. Hikma Pharm. USA Inc.*, 449 F. Supp. 3d 967 (D. Nev.), *aff'd*, 819 F. App'x 932 (Fed. Cir. 2020).

[37] Amarin Corporation PLC, "Amarin Comments on Ruling in Vascepa® ANDA Litigation" (Mar. 30, 2020), *available at* https://investor.amarincorp.com/news-releases/news-release-details/amarin-comments-ruling-vascepar-anda-litigation.

[38] *Amarin Pharma, Inc. v. Hikma Pharms. USA Inc.*, Nos. 2020-1723, 2020-1901 (Fed. Cir. Sep. 3, 2020), ECF No. 78.

[39] *Id.*, ECF No. 90.

[40] *Id.*, ECF No. 92.

to API supply issues. Amarin revealed that it "anticipate[d] that generics companies, when they launch in the United States, are likely to have limited supply capacity for VASCEPA," without explaining the basis for this belief.[41]

> **2.    Amarin settles with Teva and Apotex, significantly delaying the date of their generic launch.**

83.    While Amarin's litigation with Hikma and DRL was pending, other would-be competitors filed ANDAs for generic Vascepa and Amarin began negotiating settlement agreements with each.

84.    Amarin settled first with Teva, on May 24, 2018.[42] Under the terms of their settlement, Teva delayed its generic Vascepa launch until August 9, 2029. However, the parties agreed that the August 2029 date would be accelerated in certain circumstances, including if Amarin's patents were invalidated in patent litigation (including the pending litigation with Hikma and DRL). Amarin did not commit to supplying Teva with icosapent ethyl API.

85.    Apotex filed its ANDA seeking to launch generic Vascepa in approximately July 2016, just after the three first-filers, and sent Amarin a paragraph IV letter in September 2016. However, Apotex's 2016 ANDA did not include any of the patents included in the Hikma and DRL litigation. Apotex amended its ANDA in May 2020 to challenge additional Amarin patents concerning the HTG indication, including the patents litigated by Hikma and DRL.

---

[41] Amarin Corporation PLC, "Amarin Provides Update Following Ruling in Vascepa® Anda Patent Litigation" (Sep. 3, 2020), *available at* https://investor.amarincorp.com/news-releases/news-release-details/amarin-provides-update-following-ruling-vascepar-anda-patent.

[42] Amarin Corporation PLC, "Amarin Announces Patent Litigation Settlement Agreement with Teva," (May 24, 2018), *available at* https://investor.amarincorp.com/news-releases/news-release-details/amarin-announces-patent-litigationsettlement-agreement-teva.

86.    In June 2020, Amarin announced that it had settled with Apotex.[43] The two companies agreed on the same August 9, 2029 launch date as Teva, with a similar acceleration in the event that Amarin were to lose its appeal of the Hikma and DRL verdict (including any rehearing *en banc*). Amarin also disclosed that the settlement covered both indications of Vascepa, stating that "the agreement also substantially resolves future litigation with Apotex that could have ensued related to the December 2019 cardiovascular risk reduction indication of VASCEPA[.]"[44] As with Teva, Amarin did not make any API supply commitments as a part of its settlement with Apotex.

**C.    Generic competitors obtain the regulatory approvals needed to launch in mid-2020.**

87.    As their litigation against Amarin proceeded in the courts, Hikma and DRL simultaneously sought the regulatory approvals they needed to launch generic Vascepa.

88.    The FDA approved Hikma's ANDA for the 1g strength on May 21, 2020. On August 7, 2020, the FDA also granted final approval of DRL's ANDA for the 1g strength and tentative approval for the 500mg strength.

89.    These final approvals removed any remaining legal impediment to launch, which meant that DRL and Hikma were permitted to launch their generics at least for the 1g strength as soon as they were ready.

90.    And as the district court proceedings neared closure and then the appeal commenced, Hikma had begun to evaluate its options for an at-risk launch before the appellate

---

[43] Amarin Corporation PLC, "Amarin Announces Patent Litigation Settlement Agreement with Apotex Inc." (June 16, 2020), *available at* https://investor.amarincorp.com/news-releases/news-release-details/amarin-announces-patent-litigation-settlement-agreement-apotex.

[44] *Id.*

court ruled (and before Amarin had exhausted its petitions for rehearing) but after Hikma received final approval.[45]

## D.    Amarin impedes generic competition for Vascepa through anticompetitive API agreements.

91.    After invalidating Amarin's patents and obtaining the required FDA approval, no regulatory or legal barriers prevented at least two generic competitors—Hikma and DRL— from launching generic Vascepa, introducing price competition, and driving down prices for plaintiff and other Vascepa purchasers.

92.    But Amarin impeded the regular operation of the market, as it worked to artificially prolong its Vascepa monopoly by making it impossible for either Hikma or DRL to obtain the API needed for generic launch on a reasonable timeline.

### 1.    Amarin uses exclusive licenses to tie up API supply.

93.    The courts having invalidated more than a dozen patents and crushing its patent litigation strategy, and facing imminent generic entry on its only product, Amarin turned to its next trick to unlawfully protect Vascepa from price competition: preventing its competitors from obtaining icosapent ethyl, the active pharmaceutical ingredient in brand and generic Vascepa.

94.    The FDA must approve an API supplier's facilities, process, and product before a particular API can be used. Rather than beginning this process anew for each new generic drug—which involves substantial time and expenses, and risks failure to obtain FDA approval—it is more efficient and less expensive to source API from a manufacturer that

---

[45] Kyle Blankenship, "Disaster At Amarin: Patent Loss Spurs Stock Spiral, But All Hope Might Not Be Lost," Fierce Pharma (Mar. 30, 2020), *available at* https://www.fiercepharma.com/pharma/disaster-at-amarin-stocks-plummet-70-after-patent-challenge-loss-for-vascepa-maker

- 26 -

already has FDA approval or that is a good candidate for FDA approval because its manufacturing practices already satisfy FDA standards.

95.     To identify viable API manufacturers, generic companies often search for DMFs, the submissions API suppliers make to the FDA providing detailed information about their facility and process for a given API. By filing a DMF, a supplier that it believes its manufacturing process meets the FDA's standards. Sourcing API from a DMF holder diminishes a company's risk and makes it easier for generics to come to market.

96.     To thwart generic entry, Amarin sought to cut off potential generic competitors' access to the suppliers of icosapent ethyl API that had an FDA-approvable manufacturing process, particularly those who had submitted DMFs. By locking those suppliers into lucrative exclusive supply agreements or *de facto* exclusive supply agreements, Amarin forced generic competitors to work with less established API suppliers, causing the would-be generic competitors substantial additional costs and delay (to the extent they continued to attempt to develop generic Vascepa at all).

97.     Since as early as 2010, Amarin entered into exclusive or *de facto* exclusive agreements with the only icosapent ethyl API suppliers with sufficient ready capacity to support a commercial launch of generic icosapent ethyl drug product. These suppliers include Novasep Holding SAS (Novasep, including its subsidiary Finorga SAS, through a consortium with Slanmhor Pharmaceutical, Inc.), Nisshin Pharma Inc. (Nisshin), BASF Group (BASF, formerly Equateq), and Chemport Inc. (Chemport).

98.     Amarin entered into the first of these API supply agreements with Nisshin in November 2010. Amarin initially purchased all of its API from Japan-based Nisshin.

99.     In December 2012, Amarin announced an "exclusive … consortium" with Canada-based Slanmhor, "the world's largest supplier of concentrated omega-3 fatty acid

- 27 -

products."[46] Amarin explained that "Slanmhor, through exclusive agreements, is collaborating with [Royal DSM N.V.]/[Ocean Nutrition Canada] for the supply of intermediate omega-3 oil, and Novasep, a global leader in purification technologies and API manufacturing." Together, this consortium of companies would work to "reliably source Vascepa."

100.    About one week later, Amarin announced that it had submitted a supplemental NDA (sNDA) to the FDA, seeking to add Chemport as an additional icosapent ethyl API supplier.[47] Amarin and Chemport had signed an exclusive supply agreement in March 2011.  In announcing the Chemport sNDA, Amarin revealed that adding superfluous suppliers was a part of its generic delay strategy, stating that the "submission contributes to the planned expansion of the Vascepa manufacturing supply chain and is additional progress *toward Amarin's goal to protect the commercial potential of Vascepa to beyond 2030* through a combination of patent protection, regulatory exclusivity, trade secrets and *by taking advantage of manufacturing barriers to entry*."[48] Amarin announced that the FDA approved the Chemport sNDA in April 2013.[49]

101.    Just two weeks after announcing the Chemport sNDA, Amarin disclosed it had also submitted an sNDA to add BASF as an API supplier in December 2012.[50] In its press

---

[46] Amarin Corporation PLC, "Amarin Announces Additional Vascepa(R) (Icosapent Ethyl) Supplier," (Dec. 11, 2012), *available at* https://investor.amarincorp.com/news-releases/news-release-details/amarin-announces-additional-vascepar-icosapent-ethyl-supplier.

[47] Amarin Corporation PLC, "Amarin Announces Submission of Supplemental New Drug Application for Chemport, Inc. as an Additional Vascepa(R) Active Pharmaceutical Ingredient Supplier," (Dec. 19, 2012), *available at* https://investor.amarincorp.com/news-releases/news-release-details/amarin-announces-submission-supplemental-new-drug-application.

[48] *Id.* (emphasis added).

[49] Amarin Corporation PLC, "Amarin Announces Approval of Supplemental New Drug Application for Chemport, Inc. as an Additional Vascepa(R) Active Pharmaceutical Ingredient Supplier," (Apr. 18, 2013), *available at* https://investor.amarincorp.com/news-releases/news-release-details/amarin-announces-approval-supplemental-new-drug-application.

[50] Amarin Corporation PLC, "Amarin Announces Submission of Supplemental New Drug Application for BASF as an Additional Vascepa(R) Active Pharmaceutical Ingredient Supplier,"

- 28 -

release, Amarin doubled down on its disclosure that the acquisition of exclusive supply agreements was intended to delay generic entry by "protect[ing]" the commercial potential of Vascepa" and "taking advantage of manufacturing barriers to entry."[51] Amarin announced that the sNDA was approved on April 30, 2013.[52]

102.    On August 13, 2013, Amarin formally added yet another API supplier: France-based Novasep.[53] Although it had announced in 2012 that Novasep would be working with Slanhmor as a part of the companies' global supply agreement, Amarin submitted an sNDA to add Novasep Group, S.A.S., through its subsidiary Finorga S.A.S., as an additional icosapent ethyl API supplier in 2013. The Novasep sNDA was likewise described as a way to "protect" Vascepa and utilize "manufacturing barriers to entry."

103.    Amarin's agreements with these API suppliers contain minimum purchase requirements in exchange for exclusivity. Amarin has publicly represented that it buys "all" of the API these manufacturers produce. At least some of these agreements also require Amarin to pay the suppliers in cash if it cannot satisfy the minimum purchase requirement in order for the suppliers to maintain exclusivity with Amarin. In 2011, Amarin disclosed that pursuant to its deal with Chemport, it was required to make minimum annual purchases from Chemport ranging from approximately $7.5 to $15 million and make a minority share equity investment

---

*available at* https://investor.amarincorp.com/static-files/273659d8-76b0-419a-bac0-54dfc3c38001.

[51] *Id.*

[52] Amarin Corporation PLC, "Amarin Announces Approval of Supplemental New Drug Application for BASF as an Additional Vascepa(R) Active Pharmaceutical Ingredient Supplier," (Apr. 30, 2013), *available at* https://investor.amarincorp.com/news-releases/news-release-details/amarin-announces-approval-supplemental-new-drug-application-basf.

[53] Amarin Corporation PLC, "Amarin Announces Submission Of Supplemental New Drug Application For Novasep As Fourth Vascepa(R) Active Pharmaceutical Ingredient Supplier," (Aug. 26, 2013), *available at* https://investor.amarincorp.com/news-releases/news-release-details/amarin-announces-submission-supplemental-new-drug-application-2.

in Chemport of up to $3.3 million. Likewise, Amarin's minimum purchasing requirements with BASF cost Amarin between $10 and $20 million per year in order to maintain exclusivity.

104.    On information and belief, the quantity of API guaranteed by Amarin's minimum purchase agreements exceeds Amarin's needs to produce Vascepa, evidencing an alternative motive, beyond supplying the API quantities needed for production, for entering into the agreements. This over-purchasing by Amarin of unnecessary API is a profit sacrifice by Amarin that makes no economic sense absent the anticompetitive effects of Amarin's scheme to delay fulsome generic entry by locking up API supply.

105.    Amarin has touted the anticompetitive strategy behind its API supply contracts in its securities filings, stating in 2012 that its "agreements with our [API] suppliers include minimum purchase obligations and limited exclusivity provisions based on such minimum purchase obligations. If we do not meet the respective minimum purchase obligations in our supply agreements, our suppliers, in certain cases, will be free to sell the active pharmaceutical ingredient of Vascepa to potential competitors …. While we anticipate that intellectual property barriers and FDA regulatory exclusivity will be the primary means to protect the commercial potential of Vascepa, *the availability of Vascepa active pharmaceutical ingredient from our suppliers to our potential competitors would make our competitors' entry into the market easier and more attractive.*"

106.    There is no legitimate business rationale or pro-competitive justification for Amarin's API exclusivity agreements. Amarin did not need, and was not seeking, either this many manufacturers of or this level of supply of icosapent ethyl API, as Amarin has already sourced more API than it can use. Amarin reportedly stated in December 2018 that it had enough API supply for at least two years, totaling $1 billion in Vascepa sales. Given Amarin's

existing API supplies, it has no legitimate business reason to lock up the quantity of icosapent ethyl API encompassed by its exclusivity agreements.

107.    It is industry practice for a brand drug manufacturer to have only one to two API suppliers, even though more may be available, because qualifying suppliers and ensuring quality control is costly. Without a return elsewhere, Amarin retaining at least five exclusive API suppliers when there is no indication of supply issues makes no economic sense.

108.    The purpose of Amarin's API supply agreements is not to support its own supply chain, but rather to starve any potential generic competitors. In essence, Amarin is paying API suppliers not to do business with would-be generic competitors, either through literal exclusive agreements or through agreements that allow Amarin to effectively acquire all available API supply. Indeed, Amarin publicly admitted in November 2020 that it "continue[d] to monitor who might or might not be supplying generics."

109.    As a result of Amarin's exclusive supply agreements, potential manufacturers of generic Vascepa products were unable to procure enough icosapent ethyl API to support fulsome generic launch—or launch at all—significantly delaying generic competition and harming purchasers.

110.    Amarin recognizes that an inability to work with established API suppliers, including those with DMFs, introduces significant delay. In 2020, Amarin President and CEO John Thero described the expense and delay of associated with finding and securing an API supplier:

> It's expensive. The lead time even for a product facility that's up and running is roughly 6 months to deliver product. The lead time, taking something from a brownfield to a new plant that's in and qualified, it can be 2, 3 or more years.

111.    Indeed, this delay in generic competition was Amarin's plan. Amarin repeatedly reassured its investors that they need not worry about the threat generic entry posed to

- 31 -

Amarin's profits because generics would be unable to secure enough API supply to present any real competition to Amarin's bottom line.

112.    In April 2020, Amarin's CEO told investors that the company had "plans" for its investors to continue benefiting from Vascepa's high prices—plans that involved tracking API suppliers' contacts with generic competitors. "We have heard from various suppliers that they have been approached regarding supplying API for generic use. These suppliers informed us that they have turned down such approaches for various reasons, including that they don't have excess capacity," John Thero revealed, failing to mention the lack of capacity was the intent and result of Amarin's agreements with the suppliers. "We don't have perfect visibility of the dynamics that could contribute to the timing and capacity of a generic launch," Thero explained, "but we either have plans in place already or we are rapidly putting plans in place for a range of possible scenarios. We believe that there is an opportunity for shareholders to benefit under the most likely of these scenarios."

113.    Months later, in August 2020, Amarin publicly stated that even if DRL's and Hikma's invalidation of Amarin's patents was affirmed on appeal, "Amarin anticipates that for an extended period of time a significant portion of the icosapent ethyl market may remain branded *due to potential supply volume constraints for high quality, generic versions of VASCEPA.*"[54]

114.    In a September 2020 press release issued immediately after the Federal Circuit upheld the invalidation of its patents, Amarin stated its "anticipat[ion] that generic companies,

---

[54] Amarin Corporation, "Amarin Reports Second Quarter 2020 Financial Results and Provides Update on Operations" (Aug. 4, 2020), *available at* https://investor.amarincorp.com/news-releases/news-release-details/amarin-reports-second-quarter-2020-financial-results-and.

when they launch in the United States, are likely to have limited supply capacity for VASCEPA."[55]

115.    In November 2020, the same month of Hikma's limited release, Amarin executives were asked when they expected generics to obtain significant market share, particularly considering Hikma's API sourcing issues. President and CEO John Thero indicated that he did not anticipate generics presenting a threat to Amarin's Vascepa monopoly for *years*, responding that "putting in new manufacturing lines and qualifying those lines" to supply API "tends to take a couple of years." He reiterated that "the supply is pretty limited," the result of Amarin's anticompetitive actions.

116.    In a 2021 presentation, Amarin described the generic market environment for Vascepa as "atypical" and told its investors that it "expected" generic supply "to remain limited and potentially variable due to manufacturing complexities, costs and lead times[.]"

117.    Rather than disclose that its supply agreements with API manufacturers is delaying and frustrating generic launch, Amarin has made repeated, false statements blaming the generic manufacturers for a "shortfall" in API supply.

118.    In April 2021, Amarin publicly claimed that Hikma's and DRL's "lack of adequate planning, investment, knowhow and expertise regarding this fragile active ingredient" was to blame for their inability to obtain icosapent ethyl API.

119.    Similarly, in a May 2021 presentation to investors, Amarin repeated its misrepresentation, blaming the delay in generic launch on "limited investment by generic companies in supply capacity" rather than revealing the anticompetitive steps it had taken to effectively block these generic companies from obtaining critical API.

---

[55] Amarin Corporation, "Amarin Provides Update Following Ruling in Vascepa® ANDA Patent Litigation" (Sep. 3, 2020), *available at* https://investor.amarincorp.com/news-releases/news-release-details/amarin-provides-update-following-ruling-vascepar-anda-patent

120.     Amarin's claims that generic manufacturers are to blame for their inability to obtain icosapent ethyl API were, and remain, false. Amarin misrepresented the cause of API supply issues to conceal its efforts to exclude generic competition, frustrate the ability of generic companies to purchase API, and obscure the exclusionary nature and extent of Amarin's API purchasing agreements.

121.     Contrary to Amarin's claims, generic manufacturers were unable to source the required icosapent ethyl API due to Amarin's anticompetitive conduct. Through their false and deceptive statements, the defendants misled the public about the existence and nature of their anticompetitive scheme and created the false impression that they were engaged in fair and open competition.

122.     In April 2021, Amarin revealed that it is being investigated by the U.S. Federal Trade Commission and the New York Attorney General for its API-related conduct.

**2.     Amarin's anticompetitive conduct handicaps Hikma's launch of generic Vascepa.**

123.     After the trial court invalidated Amarin's Vascepa patents and Hikma received final approval from the FDA, no patent or regulatory barriers prevented Hikma from launching its generic Vascepa product. Hikma was free to launch its generic product in May 2020.

124.     In November 2020, after the appellate court upheld its patent victory against Amarin, Hikma effectuated a limited launch of its generic Vascepa product.

125.     But Hikma's efforts were significantly impeded by Amarin's anticompetitive efforts to lock up the supply of icosapent ethyl API. As Hikma's chief executive officer explained, Hikma launched in only limited quantities in November 2020 because Hikma was "restrained" in building inventory, "and that is linked to the access to the active ingredients."

126.     Hikma's inability to obtain sufficient API for a fulsome generic launch was anticipated and intended by Amarin, who had forecasted that generics would face this issue for

months. As Hikma's CEO Siggi Olafsson observed, it is "interesting that the CEO of Amarin seems to know so much more than I do about the supply of the generics."

127.    Amarin recognized that Hikma's launch was "atypical" for a generic. When operating as the regulatory framework intends, generic competitors quickly capture up to 80% of market share by offering a lower price than the brand. Here, however, given the limited launch due to the lack of API, Hikma secured only 9% of the icosapent ethyl market.

128.    But for Amarin's anticompetitive restriction of the required API, Hikma would have had a fulsome generic launch in November 2020, allowing for significant competition on Vascepa pricing and lower costs for the plaintiff and members of the class.

**3.    Amarin's anticompetitive conduct thwarts DRL's launch of generic Vascepa.**

129.    DRL developed its generic icosapent ethyl drug product, prevailed in patent litigation with Amarin, and obtained the necessary regulatory approval to market its generic drug by August 2020. But DRL has not launched and cannot launch because Amarin's illegal conduct foreclosed the supply of icosapent ethyl API. Absent Amarin's anticompetitive conduct, DRL would have launched its generic drug product to compete with Amarin's branded Vascepa in August 2020 when it received the necessary approval from the FDA.

130.    After prevailing in patent litigation in district court in March 2020, DRL promptly began preparing to launch its generic product. Even before receiving final FDA approval or affirmance by the Federal Circuit of the district court win, DRL contacted all API suppliers holding a DMF for icosapent ethyl API. But DRL quickly learned that Amarin had foreclosed all such suppliers with sufficient capacity to support a commercial launch in a timely manner. The other DMF holders for icosapent ethyl API do not have sufficient capacity to support a commercial launch in the next one to two years.

131.    When its efforts to identify an API supplier with a DMF for icosapent ethyl API—the most commercially reasonable and expedient option—failed, DRL had to resort to finding a new supplier and partnering with it to develop icosapent ethyl API from start, introducing significant cost and delay.

132.    Despite DRL's best efforts to launch in a timely manner, it is still unable to do so. The only reason why DRL still cannot launch is because Amarin contracted with suppliers of icosapent ethyl API not to sell to generic manufacturers including DRL, through exclusive contracts or and by buying up all available supplies, such that DRL cannot acquire the necessary API to support a timely commercial launch. But for Amarin's conduct, DRL would have launched as early as when it received FDA approval in August 2020.

### 4.    Amarin sues Hikma for induced infringement.

133.    Shortly after Hikma's limited November 2020 generic launch, Amarin sued Hikma in a Delaware federal court for patent infringement. Hikma has FDA approval to market and sell generic Vascepa for the initial approved indication (adjunct to diet to reduce triglyceride levels in adult patients with severe hypertriglyceridemia) and has lawfully carved out any reference to the second, later indication (adjunct to maximally tolerated statin therapy to reduce cardiovascular risk). Yet in this new litigation, Amarin alleges that Hikma's sale of generic Vascepa to treat severe HTG induced infringement of Amarin's patents for the later cardiovascular risk indication.

134.    As a remedy, Amarin seeks an injunction removing all of Hikma's generic Vascepa product from the market, eliminating all generic competition and restoring Amarin's monopoly.

135.    Amarin's most recent litigation against Hikma is the latest step in its long-running scheme to delay and thwart generic competition for Vascepa and unlawfully prolong its Vascepa monopoly.

## VII.    AMARIN'S MONOPOLY POWER

136.    The relevant product market is FDA-approved icosapent ethyl drug products (branded Vascepa and its AB rated generic equivalents). Since 2013, Amarin has possessed monopoly power in the United States with respect to this market.

137.    At competitive prices, Vascepa does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic Vascepa.

138.    Other, non-EPA pharmaceutical products are not regarded as reasonable substitutes for Vascepa. Treating patients with severe HTG with purified EPA reduces without increasing LDL-C, the bad-cholesterol. Other treatments for severe HTG—include treatments that contain lower levels of EPA as well as docosahexaenoic acid (DHA), such as Lovaza (omega-3-acid ethyl esters)—increase LDL-C levels, which then often requires the administration of a separate concurrent cholesterol-lowering drug, such as a statin, just to address that LDL-C increase. Vascepa only contains EPA and does not affect LDL-C levels. Additionally, purified EPA reduces cardiovascular risk in severely hypertriglyceridemic patients on top of a statin, the only TG-lowering treatment shown to confer such a benefit. Treating severe HTG with purified EPA therefore offers several unique benefits and is not substitutable for non-EPA treatments.

139.    Other fish-oil based supplements are not regarded as reasonable substitutes for Vascepa. FDA research into these products has found that they do not offer the therapeutic benefits of purified EPA and are not intended or approved to treat cardiovascular risk. Further,

- 37 -

as these supplements are not prescription drugs, they are not subject to FDA regulations and thus are not required to have well-controlled studies to demonstrate safety, efficacy, potency, and purity before sale.

140.    Even after Hikma launched with limited quantities in November 2020, due to the limited nature of the launch, Amarin's market share did not decrease significantly and remains above 85%. For example, Amarin's chief executive officer commented that even if Hikma could find "supply capacity to support tens of millions of dollars in revenue [in the nearterm] ... such level would only be a small portion of Amarin's total revenue and even a smaller portion of Vascepa's potential."

141.    There is direct evidence of Amarin's monopoly power. Amarin profitably increased the price of Vascepa by approximately 51% between 2013 and 2017. Between December 2017 and November 2019, the price increased by approximately 8% for the 1g strength. Finally, in the period between the approval of Vascepa's new indication in 2019 and September 2020, Amarin raised the price an additional 9%.

142.    Despite Amarin's regular and large price increases for Vascepa, doctors continue to prescribe Vascepa instead of switching patients to non-icosapent ethyl products or non-FDA- approved icosapent ethyl products.

143.    There is also indirect evidence of Amarin's monopoly power. Amarin has had a 100% share of the relevant market for icosapent ethyl drug products approved for sale in the United States by the FDA. Amarin maintained this 100 percent market share from 2013 through November 2020, and currently maintains a more than 85 percent share.

144.    The "SSNIP" test (also known as the "hypothetical monopolist" test) further confirms that the relevant market consists of FDA-approved icosapent ethyl products. The SSNIP test is a methodology used by antitrust economists to define a relevant market based on

empirical information. The objective of a SSNIP test is to identify the narrowest set of products for which a hypothetical monopolist could profitably impose a small but significant and non-transitory increase in price (SSNIP). If enough purchasers would accept a SSNIP rather than switch to another product, such that the price increase would be profitable, the product set that was chosen constitutes a relevant antitrust market.

145.    Here, Amarin increased the price of Vascepa by more than 51% between 2013 and 2017, and instituted additional price increases every year since. It profitably maintained these price increases for more than 7.5 years. That is substantially more than "a small but significant and non-transitory increase in price."

146.    In sum, Amarin has had a proven ability to impose a price increase far greater than a SSNIP while retaining enough sales to make the price increase profitable for a protracted period. This demonstrates under the SSNIP test that FDA-approved icosapent ethyl products are the relevant product market for purposes of this litigation.

147.    The relevant geographic market is the United States. Pharmaceutical products are sold and regulated on a nationwide basis. Additionally, because the U.S. market is limited to FDA-approved products, it can only include products sold inside the United States.

148.    There are substantial barriers to entry into the market for FDA-approved icosapent ethyl products. Potential new entrants must obtain FDA approval, a process that is expensive and can take several years. Moreover, Amarin has maintained its monopoly power by erecting additional barriers to entry, including exclusive supply agreements with the only potentially viable suppliers of icosapent ethyl API, thereby blocking generic companies from procuring the essential ingredient needed to manufacture generic Vascepa products.

## VIII.   ANTITRUST INJURY

149.    The defendants' exclusive API sourcing agreements blocked and delayed the generic competition that would have reduced prices for Vascepa purchasers, including the plaintiff and members of the proposed class.

150.    The plaintiff and the proposed class paid substantial sums to purchase Vascepa during the relevant times. Because of Amarin's anticompetitive and deceptive conduct, the plaintiff and members of the proposed class have been compelled to pay and continue to pay artificially inflated prices for Vascepa. Those prices have been substantially higher than the prices the plaintiff and members of the proposed class would have paid but for the defendants' illegal conduct.

151.    The plaintiff and members of the proposed class have sustained substantial losses and damage to their business and property in the form of these overcharges. The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

152.    But for Amarin's anticompetitive conduct, one or more generic competitors would have entered the market for Vascepa by August 2020 or earlier.

153.    Amarin's efforts to restrain competition in the relevant market has affected, and continues to substantially affect, interstate and intrastate commerce throughout the United States.

154.    Amarin's anticompetitive efforts delayed and deterred generic competitors, preventing price competition for Vascepa.

155.    Prices for Vascepa have been and will continue to be inflated as a direct and foreseeable result of the defendants' anticompetitive conduct. The inflated prices that the

plaintiff and members of the proposed class have paid and will continue to pay are traceable to, and the foreseeable result of, the defendants' overcharges.

## IX.    CLASS ACTION ALLEGATIONS

156.    The plaintiff brings this action on behalf of itself and all others similarly situated under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure:

> All persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for generic and/or brand Vascepa from Amarin, Hikma, or any other generic Vascepa manufacturer or any agents, predecessors, or successors thereof, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, during the period from August 7, 2020 through and until the anticompetitive effects of the defendants' unlawful conduct cease.

157.    Excluded from the class are Amarin and any of its officers, directors, management, employees, parents, subsidiaries, and affiliates.

158.    Also excluded from the class are the government of the United States and all agencies thereof, and all state or local governments and all agencies thereof.

159.    Members of class are so numerous and geographically dispersed that joinder of all members is impracticable. The plaintiff believes that the class is numerous and widely dispersed throughout the United States. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together. The class is readily identifiable from information and records in the defendants' possession.

160.    The plaintiff's claims are typical of the claims of the members of the class. The plaintiff and all members of the class were damaged by the same wrongful conduct of the defendants – i.e., as a result of the defendants' conduct, they paid artificially inflated prices for brand Vascepa and any available AB-rated generic equivalents.

- 41 -

161.    The plaintiff will fairly and adequately protect and represent the interests of the class. The interests of the plaintiff are coincident with, and not antagonistic to, those of the other members of the class.

162.    Counsel who represent the plaintiff are experienced in the prosecution of class action antitrust litigation, and have particular experience with class action antitrust litigations involving pharmaceutical products.

163.    Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members, because the defendants have acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate. Such generally applicable conduct is inherent in the defendants' wrongful conduct.

164.    Questions of law and fact common to the class include:

   a.    Whether the defendants unlawfully maintained monopoly power through all or part of their overall anticompetitive generic suppression scheme;

   b.    To the extent any procompetitive justifications exist, whether there were less restrictive means of achieving them;

   c.    Whether direct proof of the defendants' monopoly power is available and, if so, whether it is sufficient to prove the defendants' monopoly power without the need to define the relevant market;

   d.    Whether the defendants' scheme, in whole or in part, has substantially affected interstate commerce;

   e.    Whether the defendants' unlawful conduct, in whole or in part, caused antitrust injury through overcharges to the business or property of the plaintiff and the members of the class;

   f.    Whether Amarin's API supply agreements were necessary to yield some cognizable, non-pretextual procompetitive benefit;

   g.    Whether Amarin's anticompetitive conduct harmed competition;

   h.    Whether Amarin possessed the ability to control prices and/or exclude competition for Vascepa from January 2013 through the present;

    i.   Whether Amarin's unlawful monopolistic conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Vascepa;

    j.   Determination of a reasonable estimate of the amount of delay Amarin's unlawful monopolistic conduct caused, and;

    k.   The quantum of overcharges paid by the class in the aggregate.

165.    class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

166.    The plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## X.    FEDERAL CLAIMS FOR RELIEF

### COUNT ONE: VIOLATION OF 15 U.S.C. § 1
### CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE

167.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

168.    Amarin violated 15 U.S.C. § 1 by entering into unlawful API supply agreements that restrained competition in the market for brand Vascepa and its generic equivalents.

169.    The plaintiff has been injured in its business or property by the violation of 15 U.S.C. § 1. The plaintiff's and members of the class' injuries consist of having paid higher prices for its icosapent ethyl than it would have paid in the absence of those violations. Such injury,

called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes Amarin's conduct unlawful.

170.    From the launch of brand Vascepa in January 2013 through the present, Amarin possessed monopoly power in the relevant market – i.e., the market for sales of Vascepa in the United States. But for Amarin's wrongful conduct, as alleged herein, Amarin should have lost its monopoly power in the relevant market before August 2020.

171.    From 2010 through 2013, Amarin entered into a series of contracts with the API suppliers Slanmhor, Novasep, Nisshin, BASF, and Chemport under which Amarin paid these suppliers in exchange for their agreement not to supply icosapent ethyl API to Amarin's would-be generic competitors. Amarin entered into these in order to, and with the likely effect of, unreasonably restraining trade in the icosapent ethyl drug market, the purpose and effect of which was to: (a) delay generic entry of Vascepa in order to length the period in which Amarin could monopolize the market and make supra-competitive projects, and (b) maintain and raise the prices that plaintiff and other members of the class would pay for Vascepa.

172.    There is and was no legitimate, non-pretextual, pro-competitive business justification Amarin's conduct that outweighs its harmful effect on purchasers and competition. Amarin's conduct can only be explained by anticompetitive motives and a desire to foreclose competition in the icosapent ethyl drug market. Amarin's conduct runs contrary to industry practice and was unnecessary to provide Amarin with adequate API supply. Even if there were some conceivable and cognizable justification, Amarin's exclusive API supply agreements were not necessary to achieve such a purpose.

173.    As a direct and proximate result of Amarin's anticompetitive conduct, including the API supply agreements described herein, the plaintiff was harmed.

174.    Amarin's unlawful conduct continues and, unless restrained, will continue. Unless and until the activities complained of are enjoined, the plaintiff and members of the class will suffer immediate and irreparable injury for which they are without an adequate remedy at law.

### COUNT TWO: VIOLATION OF 15 U.S.C. § 2
### UNLAWFUL MONOPOLIZATION

175.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

176.    At all relevant times, Amarin has possessed substantial market power (i.e. monopoly power) in the icosapent ethyl drug market. Amarin possessed the power to control prices in, prevent prices from falling in, and exclude competitors from this market.

177.    That market power is coupled with strong regulatory and contractual barriers to entry.

178.    As alleged extensively above, Amarin willfully maintained its monopoly power in the icosapent ethyl drug market by using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured the plaintiff and members of the class thereby.

179.    Amarin's conscious objective was to further its dominance in the icosapent ethyl drug market by and through its exclusionary conduct.

180.    As stated more fully above, Amarin knowingly, willfully, and wrongfully maintained its monopoly power and harmed competition in order to delay generic competition, maintain monopoly power, and charge supracompetitive prices for Vascepa to the plaintiff and members of the class.

181.    Amarin's anticompetitive conduct described herein is exclusionary conduct the purpose and effect of which is to willfully maintain Amarin's monopoly power, which harms the competitive process and consumers, in violation of Section 2 of the Sherman Act.

- 45 -

182.    To the extent that Amarin is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for its exclusionary conduct that outweighs that conduct's harmful effects. Even if there were some conceivable such justification that Amarin were permitted to assert, the conduct is and was broader than necessary to achieve such a purpose.

183.    The plaintiff and the class have been injured, and unless Amarin's unlawful conduct is enjoined will continue to be injured, in their business and property as a result of Amarin's continuing monopolization in violation of Section 2 of the Sherman Act.

### COUNT THREE: DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 2 OF THE SHERMAN ACT

184.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

185.    At all relevant times, Amarin possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Amarin possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

186.    Through its overarching anticompetitive scheme, as alleged above, Amarin willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen or a historic accident, and thereby injured the plaintiff and the class. Amarin's anticompetitive conduct was done with the specific intent to maintain its monopoly in the market for icosapent ethyl in the United States.

187.    Amarin accomplished its scheme by preventing would-be competitors from obtaining the necessary API to manufacture generic Vascepa, thus delaying generic entry of Vascepa. It did so in order to lengthen the period in which Amarin's brand Vascepa could monopolize the market and Amarin could make supra-competitive profits.

- 46 -

188.    Had Amarin competed on the merits instead of unlawfully maintaining its monopoly in the market for icosapent ethyl, one or more generics would have been available in August 2020. The plaintiff and class members would have substituted lower-priced generic Vascepa for the higher-priced brand-name Vascepa for some or all of their Vascepa requirements, and would have paid substantially lower prices for brand-name Vascepa and generic Vascepa.

189.    The goal, purpose, and effect of Amarin's overarching anticompetitive scheme was to block generic drugs from entering the market for icosapent ethyl, extend its dominance in that market, and maintain Vascepa's prices at supracompetitive levels. It has had the further effect of depriving the market of competition.

190.    Amarin's scheme substantially harmed competition in the relevant market and was an unreasonable restraint of trade.

191.    There is and was no non-pretextual, procompetitive justification for Amarin's actions that outweighs the scheme's harmful effects. Even if there were some conceivable justification that Amarin could assert, the scheme is and was broader than necessary to achieve such a purpose.

192.    But for Amarin's illegal conduct, competitors would have begun marketing generic versions of Vascepa beginning in August 2020. The plaintiff's allegations comprise a violation of Section 2 of the Sherman Act, in addition to state laws as alleged below.

193.    Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), the plaintiff and the class seek a declaratory judgment that Amarin's conduct in seeking to prevent competition as described in the preceding paragraphs violates Section 2 of the Sherman Act.

194.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, the plaintiff and the class further seek equitable and injunctive relief to correct for the

- 47 -

anticompetitive market effects caused by Amarin's unlawful conduct, and the relief so as to assure that similar anticompetitive conduct does not occur in the future.

## XI.    VIOLATIONS OF STATE ANTITRUST LAWS

195.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

196.    Counts Four through Twenty-Eight are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of the class, and arise from the defendants' exclusionary, anticompetitive scheme designed to create and maintain a monopoly for Vascepa and its generic substitutes.

197.    Although each individual count relies upon state law, the essential elements of each state antitrust claim are the same. The above-alleged conduct which violates the federal Sherman Antitrust Act will, if proven, establish a claim under each of the state laws cited below.

198.    Through its anticompetitive overarching scheme and conduct described more fully above, Amarin willfully maintained monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen or a historic accident, and thereby injured the plaintiff and the class. This anticompetitive conduct was undertaken with the specific intent to maintain a monopoly in the Vascepa market in the United States.

199.    Amarin accomplished its goals by, *inter alia*, preventing would-be competitors from obtaining the necessary API to manufacture generic Vascepa, thus delaying generic entry of Vascepa. It did so in order to lengthen the period in which Amarin's brand Vascepa could monopolize the market and Amarin could make supra-competitive profits.

**COUNT FOUR: VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT, ARIZ. REV. STAT. § 44-1401, *ET SEQ.***

200.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

201.    By reason of the conduct alleged herein, defendants have violated Arizona Rev. Stat. § 44-1401, *et seq.*

202.    Under Arizona law, "[t]he establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this state, by any person for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful." Arizona Rev. Stat. § 44-1403.

203.    Amarin established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Vascepa market.

204.    Amarin's violations of Arizona law were flagrant.

205.    Amarin's unlawful conduct substantially affected Arizona's trade and commerce.

206.    As a direct and proximate cause of Amarin's unlawful conduct, the plaintiff and members of the class have been injured in their business or property and are threatened with further injury.

207.    By reason of the foregoing, the plaintiff and members of the class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq.*

**COUNT FIVE: VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT, D.C. CODE § 28-4501, *ET SEQ.***

208.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

- 49 -

209.     The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

210.     Members of the class purchased Vascepa within the District of Columbia during the class period. But for Amarin's conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

211.     Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this complaint, because "any indirect purchaser in the chain of manufacture, production or distribution of goods...shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

212.     Amarin monopolized or attempted to monopolize the market for Vascepa within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq.*

213.     The plaintiff and members of the class were injured with respect to purchases of Vascepa in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

### COUNT SIX: VIOLATION OF THE ILLINOIS ANTITRUST ACT, 740 ILL. COMP. STAT. ANN. 10/3(1), *ET SEQ.*

214.     The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

215.     The Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade ...." 740 ILCS 10/2.

– 50 –

216.     Members of the class purchased Vascepa within the State of Illinois during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

217.     Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this complaint. 740 ILCS 10/7(2).

218.     The defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for Vascepa in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, *et seq.*

219.     The plaintiff and members of the class were injured with respect to purchases of Vascepa in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

### COUNT SEVEN: VIOLATION OF THE IOWA COMPETITION LAW IOWA CODE § 553.1, *ET SEQ.*

220.     The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

221.     The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

222.     Members of the class purchased Vascepa within the State of Iowa during the class period. But for the defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

223.     The defendants attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for Vascepa, in violation of Iowa Code § 553.1, *et seq.*

224.    The plaintiff and members of the class were injured with respect to purchases of Vascepa in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

### COUNT EIGHT: VIOLATION OF MAINE'S ANTITRUST STATUTE
### ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ.*

225.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

226.    Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

227.    Members of the class purchased Vascepa within the State of Maine during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

228.    Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

229.    The defendants monopolized or attempted to monopolize the trade or commerce of Vascepa within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

230.    The plaintiff and members of the class were injured with respect to purchases of Vascepa in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

- 52 -

## COUNT NINE: VIOLATION OF MARYLAND'S ANTITRUST STATUTE
### MD. CODE ANN. § 11-204(A), *ET SEQ.*

231.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein..

232.    Under Maryland law, any political subdivision organized under the authority of the State is entitled to bring an action for damages and an injunction under the antitrust statute, "regardless of whether it dealt directly or indirectly with the person who has committed the violation." Md. Code Ann. § 11-209(b)(1), (b)(3).

233.    Maryland's antitrust statute makes it unlawful to, *inter alia*, "Monopolize, attempt to monopolize, or combine or conspire with one or more other persons to monopolize any part of the trade or commerce within the State, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce." Md. Code Ann. § 11-204(a)(2).

234.    The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." Md. Code Ann. § 11-202(a)(1).

235.    The defendants monopolized or attempted to monopolize the trade or commerce of Vascepa within the intrastate commerce of Maryland, in violation of Md. Code Ann.§ 204(a)(2), *et seq.*

236.    Under Maryland's antitrust statute, a plaintiff who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonably attorneys' fees. Md. Code Ann. § 209(b)(4).

237.    The plaintiff and members of the class were injured with respect to purchases of Vascepa in Maryland and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

- 53 -

## COUNT TEN: VIOLATION OF MASSACHUSETTS
## MASS. GEN. LAWS CH. 93A, §1, *ET SEQ.*

238.     The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

239.     By reason of the conduct alleged herein, including the violation of federal antitrust laws, defendants have violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A § 2, *et seq.*

240.     Members of the class purchased Vascepa within the State of Massachusetts during the class period. But for defendants' conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

241.     The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, a substantial part of which occurred within Massachusetts, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Vascepa market.

242.     The defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Massachusetts.

243.     The defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

244.     As a direct and proximate cause of defendants' unlawful conduct, the plaintiff and the members of the class have been injured in their business or property and are threatened with further injury.

245.     By reason of the foregoing, the plaintiff and the class are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under Mass. Gen. Laws Ch. 93A § 9.

011009-11/1559228 V1

246.    Pursuant to Mass. Gen. Laws Ch. 93A § 9, the plaintiff mailed to all defendants, via certified mail, return receipt requested, demand for payment letters which explained the unfair acts, the injury suffered, and requested relief from the defendants.

### COUNT ELEVEN: VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT MICH. COMP. LAWS § 445.771, *ET SEQ.*

247.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

248.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce…to prohibit monopolies and attempts to monopolize trade or commerce…[and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

249.    Members of the class purchased Vascepa within the State of Michigan during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

250.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. Mich. Comp. Laws. § 452.778(2).

251.    The defendants established, maintained, or used, or attempted to establish, maintain, or use, a monopoly of trade or commerce in violation of Mich. Comp. Laws. §445.773.

252.    The plaintiff and members of the class were injured with respect to purchases of Vascepa in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## COUNT TWELVE: VIOLATION OF THE MINNESOTA ANTITRUST LAW, MINN. STAT. §§ 325D.49 *ET SEQ.* & 325D.57, *ET SEQ.*

253.     The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

254.     The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

255.     Members of the class purchased Vascepa within the State of Minnesota during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

256.     Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

257.     The defendants established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for Vascepa within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for Vascepa within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq.*

258.     The plaintiff and members of the class were injured with respect to purchases of Vascepa in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

## COUNT THIRTEEN: VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE, MISS. CODE ANN. § 75-21-1, *ET SEQ.*

259.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

260.    Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

261.    Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

262.    Members of the class purchased Vascepa within the State of Mississippi during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

263.    Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

264.    The defendants monopolized or attempted to monopolize the production, control or sale of Vascepa, in violation of Miss. Code Ann. § 75-21-3, *et seq.*

265.    The defendants' Vascepa are sold indirectly via distributors throughout the State of Mississippi. During the class period, the defendants' illegal conduct substantially affected Mississippi commerce.

011009-11/1559228 V1

266.    The plaintiff and members of the class were injured with respect to purchases of Vascepa in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

## COUNT FOURTEEN: VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT, MO. ANN. STAT. § 407.010, *ET SEQ.*

267.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

268.    Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

269.    Members of the class purchased Vascepa within the State of Missouri during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

270.    Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

271.    The defendants monopolized or attempted to monopolize the market for Vascepa within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq.*

272.    The plaintiff and members of the class were injured with respect to purchases of Vascepa in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## COUNT FIFTEEN: VIOLATION OF THE NEBRASKA JUNKIN ACT, NEB. REV. STAT. § 59-801, *ET SEQ.*

273.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

274.    Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

275.    Members of the class purchased Vascepa within the State of Nebraska during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

276.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

277.    The defendants monopolized or attempted to monopolize the market for Vascepa within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq.*

278.    The plaintiff and members of the class were injured with respect to purchases of Vascepa in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## COUNT SIXTEEN: VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. § 598A.010, *ET SEQ.*

279.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

- 59 -

280.    The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities...is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

281.    The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

282.    Members of the class purchased Vascepa within the State of Nevada during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

283.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

284.    The defendants monopolized or attempted monopolize trade or commerce of Vascepa within the intrastate commerce of Nevada, in violation of Nev. Rev. Stat. Ann. § 598A, *et seq*.

285.    The plaintiff and members of the class were injured with respect to purchases of Vascepa in Nevada in that numerous sales of defendants' Vascepa took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by defendants' conduct.

286.    Accordingly, the plaintiff and members of the class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

287.    In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by the plaintiff.

011009-11/1559228 V1

## COUNT SEVENTEEN: VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE, N.H. REV. STAT. ANN. TIT. XXXI, § 356, *ET SEQ.*

288.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

289.    Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.

290.    Members of the class purchased Vascepa within the State of New Hampshire during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

291.    Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

292.    The defendants established, maintained or used monopoly power, or attempted to, in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

293.    The plaintiff and members of the class were injured with respect to purchases of Vascepa in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

## COUNT EIGHTEEN: VIOLATION OF THE NEW MEXICO ANTITRUST ACT, N.M. STAT. ANN. §§ 57-1-1, *ET SEQ.*

294.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

295.    The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

011009-11/1559228 V1

296.    Members of the class purchased Vascepa within the State of New Mexico during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

297.    Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

298.    The defendants monopolized or attempted to monopolize trade for Vascepa within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. §§ 57-1-1 and 57-1-2, *et seq.*

299.    The plaintiff and members of the class were injured with respect to purchases of Vascepa in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## COUNT NINETEEN: VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL BUSINESS LAW

300.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

301.    Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

302.    Members of the class purchased Vascepa within the State of New York during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

303.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

304.    The defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of Vascepa and restrained competition in the free exercise of the conduct of the business of Vascepa within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

305.    The plaintiff and members of the class were injured with respect to purchases of Vascepa in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees and all relief available under N.Y. Gen. Bus. Law §349, *et seq.*

## COUNT TWENTY: VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES, N.C. GEN. STAT. § 75-1, *ET SEQ.*

306.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

307.    The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

308.    The defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

309.    As a direct and proximate cause of defendants' unlawful conduct, plaintiff and the members of the class have been injured in their business or property and are threatened with further injury.

310.    By reason of the foregoing, plaintiff and members of the class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, *et seq.*

**COUNT TWENTY-ONE: VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D. CENT. CODE § 51-08.1, *ET SEQ.***

311. The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

312. The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. N.D. Cent. Code § 51-08.1, *et seq.*

313. Members of the class purchased Vascepa within the State of North Dakota during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

314. Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08.

315. The defendants established, maintained, or used a monopoly, or attempted to do so, for the purposes of excluding competition or controlling, fixing or maintaining prices for Vascepa, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

316. The plaintiff and members of the class were injured with respect to purchases in North Dakota and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**COUNT TWENTY-TWO: VIOLATION OF THE OREGON ANTITRUST LAW, OR. REV. STAT. § 646.705, *ET SEQ.***

317. The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

318. Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 899 thereof govern antitrust violations,

with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. § 646.715.

319.    Members of the class purchased Vascepa within the State of Oregon during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

320.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

321.    The defendants monopolized or attempted to monopolize the trade or commerce of Vascepa, in violation of Or. Rev. Stat. § 646.705, *et seq.*

322.    The plaintiff and members of the class were injured with respect to purchases of Vascepa within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

**COUNT TWENTY-THREE: VIOLATION OF THE PUERTO RICO ANTITRUST ACT, P.R. LAWS TIT. 10 § 260, *ET SEQ.***

323.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

324.    The provisions of the Puerto Rican Anti-Monopoly Act of 1964 (the AMA) parallel sections 1 and 2of the Sherman Act, and other federal statutes. And those provisions are supplemented by The Regulation on Fair Competition Number VII, which proscribes certain conduct including the type engaged in by the defendants more fully described above.

325.    Under the AMA, it is unlawful to monopolize, or attempt to monopolize any part of the trade or commerce in the Commonwealth of Puerto Rico. P.R. Laws Tit. 10, §260.

- 65 -

326.     Members of the class purchased Vascepa within Puerto Rico during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

327.     By reason of the foregoing, plaintiff and members of the class are entitled to seek all forms of relief available, including treble damages, attorneys' fees, and costs of suit under P.R. Tit. 10, § 268.

## COUNT TWENTY-FOUR: VIOLATION OF THE RHODE ISLAND ANTITRUST ACT, R.I. GEN LAWS § 6-36-1, *ET SEQ*.

328.     The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

329.     The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent, or decrease competition. R.I. Gen. Laws § 636-2(a)(2).

330.     Members of the class purchased Vascepa within the State of Rhode Island during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

331.     The defendants established, maintained, or used, or attempted to establish, maintain or use, a monopoly in the trade of Vascepa for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, *et seq*.

332.     The plaintiff and members of the class were injured with respect to purchases of Vascepa in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

### COUNT TWENTY-FIVE: VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE, S.D. CODIFIED LAWS § 37-1-3.1, *ET SEQ.*

333.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

334.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1- 3.1, 3.2.

335.    Members of the class purchased Vascepa within the State of South Dakota during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

336.    Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

337.    The defendants monopolized or attempted to monopolize trade or commerce of Vascepa within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1, *et seq.*

338.    The plaintiff and members of the class were injured with respect to purchases of Vascepa in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

### COUNT TWENTY-SIX: VIOLATION OF THE UTAH ANTITRUST ACT, UTAH CODE ANN. §§ 76-10-911, *ET SEQ.*

339.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

340.    The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair

trade practices, combinations and conspiracies in restraint of trade or commerce ….” Utah Code Ann. § 76-10-3102.

341.    Members of the class purchased Vascepa within the State of Utah during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

342.    Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

343.    The defendants monopolized or attempted to monopolize trade or commerce of Vascepa, in violation of Utah Code Ann. § 76-10-3101, *et seq.*

344.    The plaintiff and members of the class who are either Utah residents or Utah citizens were injured with respect to purchases of Vascepa in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

## COUNT TWENTY-SEVEN: VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT, W. VA. CODE §47-18-1, *ET SEQ.*

345.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

346.    The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

347.    During the class period, defendants engaged in anticompetitive conduct alleged above, including the establishment or maintenance of a monopoly for the purpose of excluding competition, in violation of W. Va. Code § 47-18-1 and 47-18-20, *et seq.*

348.    The defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

349.    As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the class have been injured in their business and property in that they paid more for Vascepa than they otherwise would have paid in the absence of defendants' unlawful conduct.

350.    Members of the class have standing to pursue their claims under, *inter alia*, W. Va. Code § 47-18-9.

351.    As a result of defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, plaintiff and members of the class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

## COUNT TWENTY-EIGHT: VIOLATION OF THE WISCONSIN ANTITRUST ACT, WIS. STAT. ANN. § 133.01(1), *ET SEQ*.

352.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

353.    Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

354.    Members of the class purchased Vascepa within the State of Wisconsin during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

355.    Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(a).

356.    The defendants monopolized or attempted to monopolize the trade or commerce of Vascepa, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq.*

357.    The plaintiff and members of the class were injured with respect to purchases of Vascepa in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for defendants' Vascepa in Wisconsin.

358.    Accordingly, plaintiff and members of the class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

359.    The defendants' anticompetitive activities have directly, foreseeably and proximately caused injury to plaintiff and members of the class in the United States. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced Vascepa from defendants, (2) paying higher prices for Vascepa than they would have in the absence of defendants' conduct, and (3) being denied the opportunity to purchase generic Vascepa at a price substantially lower than what they were forced to pay for Vascepa. These injuries are of the type of the laws of the above States were designed to prevent, and flow from that which makes defendants' conduct unlawful.

360.    The defendants are jointly and severally liable for all damages suffered by the plaintiff and members of the classes.

## XII.    VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

361.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

- 70 -

362.     The defendants' above-described scheme and conduct constitutes unfair competition, unconscionable conduct, and deceptive acts and practices in violation of the state consumer protection statutes set forth below. As a direct and proximate result of defendants' anticompetitive, deceptive, unfair, and/or unconscionable acts or practices, plaintiff and the class were both denied the opportunity to purchase lower-priced generic versions of Vascepa and paid higher prices for branded Vascepa than they should have

363.     The gravity of harm from defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiff and class members could not reasonably have avoided injury from defendants' wrongful conduct.

364.     The plaintiff and members of the class purchased goods, namely Vascepa, primarily for personal, family, or household purposes.

365.     There was and is a gross disparity between the price that plaintiff and the class members paid for Vascepa and the value they received.

366.     Claims Twenty-Nine through Forty-Eight are pleaded under the consumer protection or similar laws of each State or jurisdiction identified below, on behalf of the class.

## COUNT TWENTY-NINE: VIOLATION OF ARIZONA CONSUMER FRAUD ACT ARIZ. REV. STAT. §§44-1521, *ET SEQ*.

367.     The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

368.     The Arizona Consumer Fraud Act prohibits the "[a]ct, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." Ariz. Rev. Stat. § 44-1522(A)

- 71 -

369.    By reason of the conduct alleged herein, including the violation of federal antitrust laws, defendants have violated the Arizona Consumer Fraud Act, §§ 44–1521, *et seq.*

370.    Members of the class purchased Vascepa within the State of Arizona during the class period. But for defendants' conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

371.    The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Vascepa market.

372.    The defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Arizona.

373.    The defendants' unlawful conduct substantially affected Arizona's trade and commerce.

374.    As a direct and proximate cause of defendants' unlawful conduct, the plaintiff and the members of the class have been injured in their business or property and are threatened with further injury.

375.    By reason of the foregoing, the plaintiff and the class are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs.

## COUNT THIRTY: VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE § 17200, *ET SEQ.* (THE "UCL")

376.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

377.    The violations of federal antitrust law set forth above also constitute violations of section 17200, *et seq.* of California Business and Professions Code.

378.    The defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

379.    This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these defendants for acts, as alleged herein, that violated the UCL.

380.    The defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein, including preventing would-be competitors from obtaining the necessary API to manufacture generic Vascepa, thus delaying generic entry of Vascepa, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

381.    The defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

382.    The plaintiff and members of the class are entitled to, *inter alia*, full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

383.    The unlawful and unfair business practices of The defendants, and each of them, as described above, have caused and continue to cause members of the class to pay supra-competitive and artificially-inflated prices for Vascepa sold in the State of California. Plaintiff

011009-11/1559228 V1

and the members of the class suffered injury in fact and lost money or property as a result of such unfair competition.

384.    As alleged in this complaint, defendants have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition. Plaintiff and the members of the class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.

## COUNT THIRTY-ONE: VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT, D.C. CODE § 28-3901, *ET SEQ*.

385.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

386.    Members of the class purchased Vascepa for personal, family, or household purposes.

387.    By reason of the conduct alleged herein, including preventing would-be competitors from obtaining the necessary API to manufacture generic Vascepa, thus delaying generic entry of Vascepa, defendants have violated D.C. Code § 28-3901, *et seq*.

388.    The defendants are "merchants" within the meaning of D.C. Code § 28-3901(a)(3).

389.    The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Vascepa market.

390.    The defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

- 74 -

391.    The defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

392.    As a direct and proximate cause of defendants' unlawful conduct, the plaintiff and members of the class have been injured in their business or property and are threatened with further injury.

393.    By reason of the foregoing, plaintiff and members of the class are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code § 28-3901, *et seq.*

### COUNT THIRTY-TWO: VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201(2), *ET SEQ.*

394.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

395.    The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

396.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

397.    A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

398.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this complaint. Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action …").

399.    Members of the class purchased Vascepa within the State of Florida during the class period. But for defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

400.    The defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Vascepa, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2015 and continuing through the date of this filing.

401.    Accordingly, defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

402.    The defendants' unlawful conduct substantially affected Florida's trade and commerce.

403.    As a direct and proximate cause of defendants' unlawful conduct, plaintiff and the members of the class have been injured in their business or property by virtue of overcharges for Vascepa and are threatened with further injury.

404.    By reason of the foregoing, plaintiff and the members of the class are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

## COUNT THIRTY-THREE: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILL. COMP. STAT. ANN. 505/10A, *ET SEQ*.

405.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

406.     By reason of the conduct alleged herein, defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*

407.     The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Vascepa Market.

408.     The defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

409.     The defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to the plaintiff and members of the class.

410.     The defendants' unlawful conduct substantially affected Illinois's trade and commerce.

411.     As a direct and proximate cause of defendants' unlawful conduct, the plaintiff and members of the class were actually deceived and have been injured in their business or property and are threatened with further injury.

412.     By reason of the foregoing, the plaintiff and members of the class are entitled to seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.*

## COUNT THIRTY-FOUR: VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS. CH. 93A § 1, *ET SEQ.*

413.     The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

414.     By reason of the conduct alleged herein, including the violation of federal antitrust laws, defendants have violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A § 2, *et seq.*

- 77 -

415.    Members of the class purchased Vascepa within the State of Massachusetts during the class period. But for defendants' conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

416.    The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, a substantial part of which occurred within Massachusetts, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Vascepa market.

417.    The defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Massachusetts.

418.    The defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

419.    As a direct and proximate cause of defendants' unlawful conduct, the plaintiff and the members of the class have been injured in their business or property and are threatened with further injury.

420.    By reason of the foregoing, the plaintiff and the class are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under Mass. Gen. Laws Ch. 93A § 9.

421.    Pursuant to Mass. Gen. Laws Ch. 93A § 9, the plaintiff mailed to all defendants, via certified mail, return receipt requested, demand for payment letters which explained the unfair acts, the injury suffered, and requested relief from the defendants.

## COUNT THIRTY-FIVE: VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT, MINN. STAT. § 325F.68, *ET SEQ*.

422.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

- 78 -

423.     By reason of the conduct alleged herein, defendants have violated Minn. Stat. § 325F.68, *et seq.*

424.     The defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

425.     The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, a substantial part of which occurred within Minnesota, for the purpose of controlling, fixing, or maintaining prices in the Vascepa market.

426.     The defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

427.     Amarin's conduct, specifically in its preventing would-be competitors from obtaining the necessary API to manufacture generic Vascepa, thus delaying generic entry of Vascepa, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

428.     The defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

429.     The defendants' conduct was willful.

430.     As a direct and proximate cause of defendants' unlawful conduct, the plaintiff and the members of the class have been injured in their business or property and are threatened with further injury.

431.     By reason of the foregoing, the plaintiff and the members of the class are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, *et seq.* and applicable case law.

011009-11/1559228 V1

**COUNT THIRTY-SIX: VIOLATION OF THE MONTANA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION ACT OF 1970,
MONT. CODE, §§ 30-14-103, *ET SEQ*, AND §§ 30-14-201, *ET SEQ*.**

432.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

433.    The defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*

434.    The defendants' unlawful conduct had the following effects: (1) Vascepa price competition was restrained, suppressed, and eliminated throughout Montana; (2) Vascepa prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) the plaintiff and members of the class were deprived of free and open competition; and (4) the plaintiff and members of the class paid supracompetitive, artificially inflated prices for Vascepa.

435.    During the class period, defendants' illegal conduct substantially affected Montana commerce and consumers.

436.    As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the class have been injured and are threatened with further injury. The defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*, and, accordingly, plaintiff and members of the class seek all relief available under that statute.

**COUNT THIRTY-SEVEN: VIOLATION OF THE NEBRASKA CONSUMER
PROTECTION ACT, NEB. REV. STAT. § 59-1602, *ET SEQ*.**

437.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

438.    By reason of the conduct alleged herein, defendants have violated Neb. Rev. Stat. § 59-1602, *et seq.*

439.    The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

440.    The defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of defendants' actions within the stream of Nebraska commerce.

441.    The defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

442.    The defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiff and members-of-the-class' ability to protect themselves.

443.    The defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

444.    As a direct and proximate cause of defendants' unlawful conduct, the plaintiff and the members of the class have been injured in their business or property and are threatened with further injury.

445.    By reason of the foregoing, plaintiff and members of the class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59- 1614.

## COUNT THIRTY-EIGHT: VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. § 598.0903, *ET SEQ.*

446.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

- 81 -

447.    By reason of the conduct alleged herein, defendants have violated Nev. Rev. Stat. § 598.0903, *et seq.*

448.    The defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

449.    The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Vascepa market.

450.    The defendants' conduct was unfair, unconscionable, or deceptive within conduct of commerce within the State of Nevada.

451.    The defendants' conduct, including their preventing would-be competitors from obtaining the necessary API to manufacture generic Vascepa, thus delaying generic entry of Vascepa, amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

452.    The defendants' unlawful conduct substantially affected Nevada's trade and commerce.

453.    The defendants' conduct was willful.

454.    As a direct and proximate cause of defendants' unlawful conduct, the members of the class have been injured in their business or property and are threatened with further injury.

455.    By reason of the foregoing, the class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

## COUNT THIRTY-NINE: VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT, N.H. REV. STAT. ANN. TIT. XXXI, § 358-A, *ET SEQ*.

456.     The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

457.     By reason of the conduct alleged herein, defendants have violated N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, *et seq*.

458.     The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

459.     The defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of defendants' actions within the stream of New Hampshire commerce.

460.     The defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

461.     The defendants' conduct was willful and knowing.

462.     The defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiff's and members of the class' ability to protect themselves.

463.     The defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

464.     As a direct and proximate cause of defendants' unlawful conduct, the plaintiff and the members of the class have been injured in their business or property and are threatened with further injury.

465.    By reason of the foregoing, the plaintiff and the members of the class are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

## COUNT FORTY: VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT, N.M. STAT. ANN. §§ 57-12-1, *ET SEQ.*

466.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

467.    By reason of the conduct alleged herein, defendants have violated N.M. Stat. Ann. §§ 57-12-3, *et seq.*

468.    The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Vascepa market.

469.    The defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

470.    The defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiff and members of the class.

471.    The defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

472.    The defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the New Mexico class members and the price paid by them for Vascepa as set forth in N.M. Stat. Ann. § 57-12-2E.

473.    The defendants' conduct was willful.

011009-11/1559228 V1

474.    As a direct and proximate cause of defendants' unlawful conduct, the plaintiff and the members of the class have been injured in their business or property and are threatened with further injury.

475.    By reason of the foregoing, the plaintiff and members of the class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

## COUNT FORTY-ONE: VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT, N.C. GEN. STAT. § 75-1.1, *ET SEQ.*

476.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

477.    By reason of the conduct alleged herein, defendants have violated N.C. Gen. Stat. § 75-1.1, *et seq.*

478.    The defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

479.    The defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

480.    The defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to the plaintiff and members of the class.

481.    The defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

482.    The defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

- 85 -

483.    As a direct and proximate cause of defendants' unlawful conduct, the plaintiff and the members of the class have been injured in their business or property and are threatened with further injury.

484.    By reason of the foregoing, the plaintiff and the members of the class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 7516.

### COUNT FORTY-TWO: VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT, OR. REV. STAT. § 646.605, *ET SEQ.*

485.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

486.    By reason of the conduct alleged herein, defendants have violated Or. Rev. Stat. § 646.608, *et seq.*

487.    The defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Vascepa market, a substantial part of which occurred within Oregon.

488.    The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

489.    The defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of the defendants' actions within the stream of Oregon commerce.

490.    The defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

491.    The defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiff's and members of the class' ability to protect themselves.

- 86 -

492. The defendants' unlawful conduct substantially affected Oregon's trade and commerce.

493. As a direct and proximate cause of the defendants' unlawful conduct, the plaintiff and the members of the class have been injured in their business or property and are threatened with further injury.

494. By reason of the foregoing, the plaintiff and the members of the class are entitled to seek all forms of relief available under Or. Rev. Stat. § 646.638.

495. Pursuant to section 646.638 of the Oregon Unlawful Trade Practices Act, with the filing of this action, a copy of this complaint is being served upon the Attorney General of Oregon.

## COUNT FORTY-THREE: VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT, R.I. GEN. LAWS § 6-13.1-1, *ET SEQ.*

496. The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

497. By reason of the conduct alleged herein, defendants have violated R.I. Gen. Laws § 6-13.1-1, *et seq.*

498. The defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

499. The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, a substantial part of which occurred within Rhode Island, for the purpose of controlling, fixing, or maintaining prices in the Vascepa market.

500. The defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

- 87 -

501.    The defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

502.    The defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

503.    The defendants' conduct was willful.

504.    The defendants deliberately failed to disclose material facts to the plaintiff and members of the class concerning the defendants' unlawful activities, including their preventing would-be competitors from obtaining the necessary API to manufacture generic Vascepa, thus delaying generic entry of Vascepa.

505.    The defendants' deception constitutes information necessary to the plaintiff and members of the class relating to the cost of Vascepa purchased.

506.    The plaintiff and members of the class purchased goods, namely Vascepa, primarily for personal, family, or household purposes.

507.    As a direct and proximate cause of defendants' unlawful conduct, the plaintiff and the members of the class have been injured in their business or property and are threatened with further injury.

508.    By reason of the foregoing, the plaintiff and the members of the class are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. Gen. Laws § 6-13.1-5.2.

## COUNT FORTY-FOUR: VIOLATION OF THE SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-10, *ET SEQ*.

509.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

510.    By reason of the conduct alleged herein, defendants have violated S.C. Code Ann. §§ 39-5-10.

- 88 -

511.    The defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Vascepa market, a substantial part of which occurred within Oregon.

512.    The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

513.    The defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of the defendants' actions within the stream of South Carolina commerce.

514.    The defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

515.    The defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiff's and members of the class' ability to protect themselves.

516.    The defendants' unlawful conduct substantially affected South Carolina trade and commerce.

517.    The defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as nearly all members of the public purchase and consume Vascepa.

### COUNT FORTY-FIVE: VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW, S.D. CODIFIED LAWS § 37-24, *ET SEQ.*

518.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

519.    By reason of the conduct alleged herein, defendants have violated S.D. Codified Laws § 37-24-6.

- 89 -

520.    The defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

521.    The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, a substantial part of which occurred within South Dakota, for the purpose of controlling, fixing, or maintaining prices in the Vascepa market.

522.    The defendants' conduct, including their preventing would-be competitors from obtaining the necessary API to manufacture generic Vascepa, thus delaying generic entry of Vascepa, was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Dakota.

523.    The defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

524.    The defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

525.    The defendants' conduct was willful.

526.    As a direct and proximate cause of defendants' unlawful conduct, the plaintiff and the members of the class have been injured in their business or property and are threatened with further injury.

527.    By reason of the foregoing, the plaintiff and the members of the class are entitled to seek all forms of relief, including actual damages and injunctive relief under S.D. Codified Laws § 37-24-31.

### COUNT FORTY-SIX: VIOLATION OF THE VERMONT CONSUMER FRAUD ACT VT. STAT. ANN. TIT. 9, CH. 63 §2451, *ET SEQ.*

528.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

529.    Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, *inter alia*, unfair methods competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization. Vt. Stat. Ann. Tit. 9 § 2453(a).

530.    Members of the class purchased Vascepa within the State of Vermont during the class period. But for the defendants' conduct set forth herein, the price of Vascepa would have been lower, in an amount to be determined at trial.

531.    Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this complaint. Vt. Stat. Ann. Tit. 9, § 2465(b).

532.    The defendants competed unfairly by restraining trade as set forth herein, in violation of Vt. Stat. Ann. Tit. 9, § 2453, *et seq.*

533.    The plaintiff and members of the classes were injured with respect to purchases of Vascepa in Vermont and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees

## COUNT FORTY-SEVEN: VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT, VA. CODE ANN. § 59.1- 196, *ET SEQ.*

534.    Plaintiff incorporates each and every allegation set forth in the preceding paragraphs of this complaint.

535.    By reason of the conduct alleged herein, defendants have violated Va. Code Ann. § 59.1- 196, *et seq.*

536.    The defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Vascepa market, a substantial part of which occurred within Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Vascepa market.

- 91 -

537.    The defendants' conduct caused or was intended to cause unfair methods of competition within the State of Virginia.

538.    The defendants' unlawful conduct substantially affected Virginia's trade and commerce.

539.    As a direct and proximate cause of defendants' unlawful conduct, the plaintiff and the members class have been injured in their business or property and are threatened with further injury.

540.    By reason of the foregoing, the plaintiff and the members of the class are entitled to seek all forms of relief, including actual damages, treble damages, plus reasonable attorney's fees under Virginia Code Ann. § 59.1-196, *et seq.*.

## COUNT FORTY-EIGHT: VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT, W. VA. CODE § 46A-6-101, *ET SEQ*.

541.    The plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

542.    The West Virginia Consumer Credit and Protection Act prohibits, *inter alia*, "unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code Ann. § 46A-6-104.

543.    The violations of federal antitrust law set forth above also constitute violations of section 46A-6-101, *et seq.* of the West Virginia Code.

544.    During the class period, defendants engaged in the unfair and deceptive conduct alleged above.

545.    The defendants' unfair and deceptive acts described above were knowing, willful and constitute violations or flagrant violations of West Virginia law.

546.    As a direct and proximate result of defendants' unlawful conduct, the plaintiff and members of the class have been injured in their business and property in that they paid

more for Vascepa than they otherwise would have paid in the absence of defendants' unlawful conduct.

547.    As a result of defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, plaintiff and members of the class seek all recoverable damages and their cost of suit, including reasonable attorneys' fees, pursuant to sections 46A-5-101(a) and 46A-5-104 of the West Virginia Code

548.    Counsel sent a demand letter to Amarin Pharmaceuticals Ltd.; Amarin Clinical Research, Inc.; and Amarin Pharmaceuticals US, Inc. This demand letter satisfies the requirements of West Virginia Code § 46A-6-106(c). The demand letter, which was sent via certified mail, return receipt requested, identified the claimants as "purchasers of Vascepa" in individual and representative capacities; described the unfair or deceptive acts or practices committed by Amarin; described the injury suffered (increased prices for Vascepa due to Amarin's anticompetitive restrictions on API supply); set forth a demand for relief (treble damages, attorneys' fees, litigation costs, and other sanctions); and requested an offer to cure within the statutorily prescribed time.

## COUNT FORTY-NINE: UNJUST ENRICHMENT

549.    The plaintiff incorporates by reference the allegations in the preceding paragraphs.

550.    To the extent required, this claim is pled in the alternative to the other claims in this complaint.

551.    It would be futile for the plaintiff, or any member of the class, to seek a remedy from any party with whom they had or have privity of contract; the defendants have paid no consideration to anyone for the improper benefits they received indirectly from the plaintiff and members of the class.

- 93 -

552.    As a result of their unlawful conduct described above, the defendants have and will continued to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of abiraterone acetate.

553.    A constructive trust should be imposed upon all unlawful or inequitable sums the defendants received that are traceable to the plaintiff and members of the class.

### A.    Alabama

554.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Alabama at prices that were more than they would have been but for the defendants' actions. The defendants received money from the class as a direct result of the unlawful overcharges and have retained this money. The defendants have benefitted at the expense of the class from revenue resulting from unlawful overcharges for Vascepa or its AB-rated generic equivalents. It is inequitable for the defendants to accept and retain the benefits received without compensating the plaintiff and the class.

### B.    Alaska

555.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Alaska at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants appreciated the benefits bestowed upon them by the class. The defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the plaintiff and the class.

- 94 -

### C.    Arizona

556.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Arizona at prices that were more than they would have been but for the defendants' actions. The defendants have been enriched by revenue resulting from unlawful overcharges for Vascepa or its AB-rated generic equivalents. The class has been impoverished by the overcharges for Vascepa or its AB-rated generic equivalents resulting from the defendants' unlawful conduct. The defendants' enrichment and the class's impoverishment are connected. There is no justification for the defendants' receipt of the benefits causing their enrichment and the class's impoverishment, because the class paid supra-competitive prices that inured to the defendants' benefit, and it would be inequitable for the defendants to retain any revenue gained from their unlawful overcharges. The class has no remedy at law.

### D.    Arkansas

557.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Arkansas at prices that were more than they would have been but for the defendants' actions. The defendants received money from the class as a direct result of the unlawful overcharges and have retained this money. The defendants have paid no consideration to any other person in exchange for this money. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

### E.    California

558.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in California at prices that were more than they would have been but for the defendants' actions. The defendants have

- 95 -

received a benefit from the class as a direct result of the unlawful overcharges. The defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of the class.

### F.    District of Columbia

559.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in the District of Columbia at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the class. Under the circumstances, it would be inequitable and unjust for the defendants to retain such benefits.

### G.    Florida

560.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Florida at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants appreciated the benefits bestowed upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

### H.    Georgia

561.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Georgia at prices that were more than they would have been but for the defendants' actions. The class has conferred

- 96 -

an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## I.    Hawaii

562.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Hawaii at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## J.    Idaho

563.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Idaho at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants appreciated the benefit conferred upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## K.    Illinois

564.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Illinois at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants retained the benefits

bestowed upon them under unjust circumstances arising from unlawful overcharges to the class. It is against equity, justice, and good conscience for the defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

## L.    Iowa

565.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Iowa at prices that were more than they would have been but for the defendants' actions. The defendants have been enriched by revenue resulting from unlawful overcharges for Vascepa or its AB-rated generic equivalents, which revenue resulted from anticompetitive prices paid by d the class, which inured to the defendants' benefit. The defendants' enrichment has occurred at the expense of the class. Under the circumstances, it would be unjust for the defendants to retain such benefits without compensating the class.

## M.    Kansas

566.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Kansas at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## N.    Maine

567.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Maine at prices that were

more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants were aware of or appreciated the benefit bestowed upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## O.    Maryland

568.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Maryland at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants were aware of or appreciated the benefit bestowed upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## P.    Massachusetts

569.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Massachusetts at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants were aware of or appreciated the benefit conferred upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## Q.    Michigan

570.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Michigan at prices that

- 99 -

were more than they would have been but for the defendants' actions. The defendants have received a benefit from the class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of the defendants. The defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## R.    Minnesota

571.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Minnesota at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants appreciated and knowingly accepted the benefits bestowed upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## S.    Mississippi

572.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Mississippi at prices that were more than they would have been but for the defendants' actions. The defendants received money from the class as a direct result of the unlawful overcharges. The defendants retain the benefit of overcharges received on the sales of Vascepa or its AB-rated generic equivalents, which in equity and good conscience belong to the class on account of the defendants' anticompetitive conduct. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

011009-11/1559228 V1

### T.  Missouri

573.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Missouri at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants appreciated the benefit bestowed upon them by the class. The defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the class.

### U.  Montana

574.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Montana at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

### V.  Nebraska

575.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Nebraska at prices that were more than they would have been but for the defendants' actions. The defendants received money from the class as a direct result of the unlawful overcharges and have retained this money. The defendants have paid no consideration to any other person in exchange for this money. In justice and fairness, the defendants should disgorge such money and remit the overcharged payments back to the class.

**W.    Nevada**

576.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Nevada at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants in the nature of revenue resulting from unlawful overcharges for Vascepa or its AB-rated generic equivalents. The defendants appreciated the benefits bestowed upon them by the class, for which they have paid no consideration to any other person. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

**X.    New Hampshire**

577.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in New Hampshire at prices that were more than they would have been but for the defendants' actions. The defendants have received a benefit from the class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of the defendants. Under the circumstances, it would be unconscionable for the defendants to retain such benefits.

**Y.    New Mexico**

578.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in New Mexico at prices that were more than they would have been but for the defendants' actions. The defendants have knowingly benefitted at the expense of the class from revenue resulting from unlawful overcharges for Vascepa or its AB-rated generic equivalents. To allow the defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that

- 102 -

inured to the defendants' benefit and because the defendants have paid no consideration to any other person for any of the benefits they received.

**Z.    New York**

579.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in New York at prices that were more than they would have been but for the defendants' actions. The defendants have been enriched by revenue resulting from unlawful overcharges for Vascepa or its AB-rated generic equivalents, which revenue resulted from anticompetitive prices paid by the class, which inured to the defendants' benefit. The defendants' enrichment has occurred at the expense of the class. It is against equity and good conscience for the defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**AA.    North Carolina**

580.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in North Carolina at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The class did not interfere with the defendants' affairs in any manner that conferred these benefits upon the defendants. The benefits conferred upon the defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the class. The benefits conferred upon the defendants are measurable, in that the revenue the defendants have earned due to unlawful overcharges are ascertainable by review of sales records. The defendants consciously accepted the benefits conferred upon them.

## BB.    North Dakota

581.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in North Dakota at prices that were more than they would have been but for the defendants' actions. The defendants have been enriched by revenue resulting from unlawful overcharges for Vascepa or its AB-rated generic equivalents. The class has been impoverished by the overcharges for Vascepa or its AB-rated generic equivalents resulting from the defendants' unlawful conduct. The defendants' enrichment and the class's impoverishment are connected. There is no justification for the defendants' receipt of the benefits causing their enrichment, because the class paid supra-competitive prices that inured to the defendants' benefit, and it would be inequitable for the defendants to retain any revenue gained from their unlawful overcharges. The class has no remedy at law. Under the circumstances, it would be unjust for the defendants to retain such benefits without compensating the class.

## CC.    Oregon

582.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Oregon at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants were aware of the benefit bestowed upon them by the class. Under the circumstances, it would be unjust for the defendants to retain such benefits without compensating the class.

## DD.    Pennsylvania

583.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Pennsylvania at prices

- 104 -

that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants appreciated the benefit bestowed upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## EE.    Puerto Rico

584.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Puerto Rico at prices that were more than they would have been but for the defendants' actions. The defendants have been enriched by revenue resulting from unlawful overcharges for Vascepa or its AB-rated generic equivalents. The class has been impoverished by the overcharges for Vascepa or its AB-rated generic equivalents resulting from the defendants' unlawful conduct. The defendants' enrichment and the class's impoverishment are connected. There is no justification for the defendants' receipt of the benefits causing their enrichment and the class's impoverishment, because the class paid supra-competitive prices that inured to the defendants' benefit, and it would be inequitable for the defendants to retain any revenue gained from their unlawful overcharges. The class has no remedy at law.

## FF.    Rhode Island

585.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Rhode Island at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants appreciated the

benefit bestowed upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## GG.    South Carolina

586.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in South Carolina at prices that were more than they would have been but for the defendants' actions. The benefits conferred upon the defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the class. The defendants realized value from the benefit bestowed upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## HH.    South Dakota

587.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in South Dakota at prices that were more than they would have been but for the defendants' actions. The defendants have received a benefit from the class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of defendants. The defendants were aware of the benefit bestowed upon them by the class. Under the circumstances, it would be inequitable and unjust for the defendants to retain such benefits without reimbursing the class.

## II.    Tennessee

588.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Tennessee at prices that were more than they would have been but for the defendants' actions. The class has conferred

an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants appreciated the benefit bestowed upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class. It would be futile for the class to seek a remedy from any party with whom they have privity of contract. The defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from the class with respect to the defendants' sales of Vascepa or its AB-rated generic equivalents. It would be futile for The class to exhaust all remedies against the entities with which the class has privity of contract because the class did not purchase Vascepa or its AB-rated generic equivalents directly from any defendant.

## JJ.    Utah

589.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Utah at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants were aware of or appreciated the benefit bestowed upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## KK.    Vermont

590.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Vermont at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants accepted the benefit

011009-11/1559228 V1

bestowed upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## LL.  Virginia

591.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Virginia at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants were aware of the benefit bestowed upon them. The defendants should reasonably have expected to repay the class. The benefits conferred upon the defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from the defendants' illegal and unfair actions to inflate the prices of Vascepa or its AB-rated generic equivalents. The defendants have paid no consideration to any other person for any of the benefits they have received from the class.

## MM.  West Virginia

592.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in West Virginia at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants were aware of or appreciated the benefit bestowed upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## NN.  Wisconsin

593.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Wisconsin at prices that

- 108 -

were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants appreciated the benefit bestowed upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## OO.    Wyoming

594.    The defendants unlawfully overcharged class members, who made purchases of or reimbursements for Vascepa or its AB-rated generic equivalents in Wyoming at prices that were more than they would have been but for the defendants' actions. The class has conferred an economic benefit upon the defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the class. The defendants accepted, used and enjoyed the benefits bestowed upon them by the class. Under the circumstances, it would be inequitable for the defendants to retain such benefits without compensating the class.

## XIII.    COMPLIANCE WITH NOTICE REQUIREMENTS

595.    In accordance with the requirements of ARIZONA REV. STAT. § 44‑1415, 815 ILL. COMP. STAT. ANN. 505/10A, 5 ME REV. STAT. § 213(3), MINN. STAT. § 325D.63, MO. REV. STAT. § 407.025.7, MONT. CODE § 30‑14‑133, NEV. REV. STAT. § 598A.210(3), N.Y. GEN. BUS. LAW § 340(5), OR. REV. STAT. § 646.780(5)(B), OR. REV. STAT. § 646.638(2), R.I. GEN. LAWS § 6‑36‑21, SC CODE § 39‑5‑140, UTAH CODE ANN. § 76‑10‑2109(9), and W. V. CODE §46A‑6‑106(c) upon filing counsel will send letters by certified mail, return receipt requested, to:

      a.   Mark Brnovich, Attorney General of Arizona;

      b.   Kwame Raoul, Attorney General of Illinois;

      c.   Aaron Frey, Attorney General of Maine;

      d.   Keith Ellison, Attorney General of Minnesota;

e.   Eric Schmitt, Attorney General of Missouri;

f.   Austin Knudsen, Attorney General of Montana;

g.   Aaron Ford, Attorney General of Nevada;

h.   Letitia James, Attorney General of New York;

i.   Ellen Rosenblum, Attorney General of Oregon;

j.   Peter Neronha, Attorney General of Rhode Island;

k.   Alan Wilson, Attorney General of South Carolina;

l.   Sean Reyes, Attorney General of Utah; and

m.   Patrick Morrisey, Attorney General of West Virginia

informing them of the existence of this consolidated class action complaint, identifying the relevant state provisions, and enclosing a copy of this complaint.

## XIV.   PRAYER FOR RELIEF

Accordingly, the plaintiff respectfully requests that:

A.     The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) and direct that reasonable notice of this action be given to each and every member of the class as provided by Rule 23(c)(2);

B.     That the defendants' unlawful monopoly maintenance and agreements in restraint of trade alleged herein be adjudged and decreed violations of Sections 1 and 2 of the Sherman Act, as well as state consumer and antitrust law, as alleged herein;

C.     The plaintiff and members of the class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of the plaintiff and members of the class be entered against the defendants in an amount to be trebled to the extent such laws permit;

D.    The defendants be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the monopoly, contract, conspiracy, or combination alleged herein, or from entering into any other monopoly, contract, conspiracy, or combination having a similar purpose or effect;

E.    The plaintiff and the members of the class be awarded restitution for the defendants' ill-gotten gains resulting from their unlawful and inequitable unjust enrichment;

F.    The plaintiff and the members of the class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

G.    The plaintiff and members of the class be granted such other and further relief as the case may require and the Court deems just and proper.

## XV.    JURY DEMAND

The plaintiff demands a jury trial on all claims so triable.

DATED June 11, 2021.                          Respectfully submitted,

_/s/ Frank R. Schirripa_
Frank R. Schirripa
Seth M. Pavsner
HACH ROSE SCHIRRIPA & CHEVERIE LLP
112 Madison Avenue, 10th Floor
New York, New York 10016
Phone: (212) 213-8311

Thomas M. Sobol
Lauren G. Barnes
Abbye R. Klamann Ognibene
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
tom@hbsslaw.com
lauren@hbsslaw.com
abbyeo@hbsslaw.com

James R. Dugan, II
David S. Scalia
TerriAnne Benedetto
THE DUGAN LAW FIRM
One Canal Place, Suite 1000
365 Canal Street
New Orleans, LA 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181
jdugan@dugan-lawfirm.com
dscalia@dugan-lawfirm.com
tbenedetto@dugan-lawfirm.com

*Counsel for Plaintiff and the Proposed Class*